Hillsborough-northern judicial district
No. 99-473

CERTAIN UNDERWRITERS AT LLOYD'S LONDON & a.

v.

THE HOME INSURANCE COMPANY

September 6, 2001

*Devine, Millimet & Branch,* of Manchester, and *Lord, Bissell & Brook,* of Chicago, Illinois (*Andrew D. Dunn* and *Robert R. Robinson* on the brief, and *Mr. Robinson* orally), for the plaintiffs.

*Sulloway & Hollis, P.L.L.C.,* of Concord, and *Jonathan Rosen,* of New York, New York (*Margaret H. Nelson & a.* on the brief, and *Martin L. Gross* orally), for the defendant.

BRODERICK, J. This case concerns a certificate of reinsurance (reinsurance policy) issued by the plaintiffs, Certain Underwriters

at Lloyd's London and other London reinsurers (collectively, London Reinsurers) to the defendant, The Home Insurance Company (Home). London Reinsurers refused to reimburse Home for a claim arising under its reinsurance policy and filed a declaratory judgment action to determine whether it was obligated to do so. The Superior Court (*Sullivan*, J.) ruled that Home breached the notice requirement of the reinsurance policy in bad faith and that London Reinsurers was, therefore, not required to provide reimbursement. We affirm.

The record supports the following facts. In 1966, Home issued a liability insurance policy to the Hanna Mining Company (Hanna), which provided coverage of five million dollars per claim for the period August 1, 1966, through August 1, 1969. Home's policy was excess to Hanna's underlying policy with another insurer. Subsequently, the London Reinsurers issued a reinsurance policy to Home. Under the policy, London Reinsurers agreed to indemnify Home up to one million dollars on any claim for which Home was obligated to pay Hanna.

According to the terms of the reinsurance policy, Home was obligated to notify London Reinsurers of any claims against Hanna for which coverage might be triggered under its liability policy. In addition, London Reinsurers had the right, after notification of such a claim, to exercise total control over its investigation, processing and disposition. In 1984, Hanna informed Home that the Blackbird Mine in Idaho, which Hanna owned and operated in the late 1960s, had suffered pollution damage. Because Hanna believed that its liability exposure could be in the millions of dollars, Hanna requested that Home notify all of Hanna's primary and excess liability insurers. Home, however, did not notify London Reinsurers of this potential loss.

The litigation involving the Blackbird Mine was complex and protracted. In 1995, Hanna settled the outstanding claim and Home paid it under its liability policy. When Home sought reimbursement from London Reinsurers, its request was denied on the basis that it breached the notification and claims control requirements of the reinsurance policy. A detailed examination into the underlying environmental litigation and Home's repeated failure to notify London Reinsurers is unnecessary here, as late notice under the reinsurance policy is not challenged on appeal. The sole issue before us is whether Home's breach of the notice requirement relieved London Reinsurers of its obligation to indemnify Home under the reinsurance policy.

Relying upon California and New York common law, the trial court found that Home's breach of the notice requirement was a result of bad faith and prejudiced London Reinsurers' ability to investigate and dispose of the claim against Hanna. The court based its finding of bad faith on: (1) Home's failure to maintain proper procedures, guidelines and controls to ensure appropriate notice to London Reinsurers; and (2) Home's lack of awareness of its reinsurance policy with London Reinsurers from 1984 to 1995 resulting from its lack of diligence and faulty procedures. The trial court concluded that London Reinsurers had been prejudiced because: (1) it was deprived of its right under the policy to control the investigation and disposition of the claim; and (2) it was unable to establish economic reserves and receive potential tax benefits associated with such reserves.

On appeal, Home argues that the trial court erred in ruling that its late notice foreclosed its right to indemnification because London Reinsurers failed to prove prejudice under the standards of *Unigard Security Insurance Co., Inc. v. North River Insurance Co.*, 4 F.3d 1049 (2d Cir. 1993), and there was no proof that its late notice was the result of bad faith. *See id.* Because we conclude that the trial court properly found that Home's late notice was the result of bad faith which, alone, is sufficient to foreclose indemnification, we need not decide whether London Reinsurers suffered any actual prejudice. *See id.* at 1069.

■ The trend in modern case law is to recognize that "a very high level of good faith" is required in the relationship between reinsurers and reinsureds. *Id.* at 1066, 1069; *see also Compagnie de Reassurance v. New England Reinsur.*, 57 F.3d 56, 72-73 (1st Cir. 1995); *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1213 (3d Cir. 1995). This duty obligates the reinsured "to place the reinsurer in the same situation as [itself] and to give [to the reinsurer] the same means and opportunity of judging the value of the risks." *Unigard*, 4 F.3d at 1069 (quotation, brackets and ellipses omitted). Because the reinsurer relies on the reinsured for information in order to properly assess the risks, the good faith standard particularly applies to reinsureds timely notifying reinsurers of potential claims.

In *Unigard*, North River Insurance Company (North River) issued two excess liability policies to Owens-Corning Fiberglass Corporation (Owens-Corning). *See id.* at 1055. North River, in turn, purchased reinsurance from Unigard Security Insurance Company (Unigard) and other reinsurers to indemnify it from losses arising

under the second excess liability policy issued to Owens-Corning. *See id.* In the early 1980s, Owens-Corning was subject to a significant number of asbestos claims covered by the North River liability policies. *See id.* North River turned to its reinsurers to indemnify it from such losses. Unigard filed a declaratory judgment action seeking to be relieved of any obligation to indemnify North River based, in part, on North River's breach of the notice requirement under the reinsurance policy. *See id.* at 1049, 1064. The court ruled that, although North River's notice was untimely, Unigard failed to prove it was prejudiced by the untimely notice, as required by New York law in the context of reinsurance. *See id.* at 1069; *see also Unigard Sec. Ins. v. North River Ins.*, 594 N.E.2d 571, 571 (N.Y. 1992).

Consistent with its prior holding in *Christiania General Insurance Corp. v. Great American Insurance Co.*, 979 F.2d 268, 281 (2d Cir. 1992), however, the Second Circuit also ruled that "a [reinsured's] failure to provide prompt notice may entitle the reinsurer to relief without showing prejudice if the [reinsured] acted in bad faith." *Unigard*, 4 F.3d at 1069 (quotation omitted). *Unigard* established that a reinsurer must demonstrate, at a miniumum, that its reinsured acted with gross negligence or recklessness in order to prove bad faith. *See id.* In assessing the difference between negligence and gross negligence in the context of notification, the court stated:

> [I]f a [reinsured] has implemented routine practices and controls to ensure notification to reinsurers but inadvertence causes a lapse, the [reinsured] has not acted in bad faith. But if a [reinsured] does not implement such practices and controls, then it has willfully disregarded the risk to reinsurers and is guilty of gross negligence. A reinsurer, dependent on its [reinsured] for information, should be able to expect at least this level of protection, and, if a [reinsured] fails to provide it, the reinsurer's late loss notice defense should succeed.

*Id.* Since a coordinated and coherent policy existed directing that reinsurers be notified of asbestos related claims, the court found North River's late notice merely negligent and, thus, Unigard was not relieved of its obligation to indemnify. *See id.* at 1070.

We adopt the Second Circuit's rule that a reinsurer may be relieved from indemnifying its reinsured if it proves that the reinsured's late notice was due to gross negligence or recklessness,

*i.e.*, bad faith. Such a circumstance can be established upon proof that a reinsured failed to implement practices and controls to ensure proper and timely notice of claims to the reinsurer. *See id.* at 1069.

■ We now examine whether, on the record before us, London Reinsurers demonstrated that Home's late notice constituted bad faith as a result of gross negligence or recklessness. Whether or not an insurance company has acted in bad faith is a question of fact. *See Gelinas v. Metropolitan Prop. & Liability Ins. Co.*, 131 N.H. 154, 160 (1988). We conclude that this rule applies with equal force in the field of reinsurance. Here, the trial court found that Home acted in bad faith by failing to implement notification practices, procedures and controls. Such a finding "will not be overturned on appeal unless it is lacking in evidential support or tainted by error of law." *Id.* at 160-61 (quotation omitted). Because the trier of fact is "in the best position to evaluate the evidence, measure its persuasiveness and appraise the credibility of witnesses," we afford its findings considerable deference. *Walker v. Percy*, 142 N.H. 345, 352 (1997) (quotation omitted).

The record portrays Home as a bureaucracy lacking effective communication and continuity among departments. As a result, Home did not attempt to find its "policy file" to determine whether any reinsurance was available until 1995, *eleven years* after it first received notice of the potential loss at the Blackbird Mine. Further, Home's attempt to locate the "policy file" came after it made multiple decisions about the Blackbird claim and the pending litigation which, under its reinsurance policy, should have been made by, or at least have involved, London Reinsurers.

Home's assistant vice president of reinsurance claims, Allison Harmony, testified that Home did not have any formal guidelines for determining what claims were to be reported to its reinsurers and that Home "didn't track its . . . reinsurance." Indeed, although Harmony was vice president of reinsurance claims, she first became aware that reinsurance might exist when Sonia Valdes, an employee of Home's direct insurance department, so informed her in 1995. Only then did she open a file regarding the Blackbird Mine in the reinsurance department.

Harmony, however, soon discovered that she had no information concerning Home's reinsurance with London Reinsurers. Valdes testified that she had very little knowledge of how reinsurance works or "anything else" involving reinsurance. Eventually, Home's counsel provided the information and London Reinsurers was notified of the underlying claim. Neither Valdes, Harmony nor

anyone else who testified for Home ever read the reinsurance policy at issue and, as the trial judge found, "Home made no effort at all to even determine what its obligations were under the Reinsurance Policy, never mind comply with them." We reiterate that the good faith standard between reinsurers and reinsureds exists so that the reinsurer is provided the same means and opportunity to judge the risks as the reinsured. What occurred in this case was not simply an inadvertent failure to notify a reinsurer, but a grossly negligent and reckless disregard of the risks to the reinsurer.

Home points to Valdes' trial testimony as evidence that practices and procedures relating to notification were in effect and followed. The trial judge was in the best position to assess witness credibility, and we will not second-guess his conclusion unless the finding is clearly erroneous or unsupported by the evidence. *See Society Hill at Merrimack Condo. Assoc. v. Town of Merrimack*, 139 N.H. 253, 256 (1994). First, Valdes' deposition testimony contradicted her trial testimony. Further, the record reflects that the reinsurance department was responsible for identifying applicable reinsurance policies, not Valdes. As noted earlier, the assistant vice president of Home's reinsurance department testified that there were no formal procedures in place to ensure proper and timely notice to reinsurers. Valdes admitted to having little, if any, knowledge about reinsurance procedures. Given the evidence presented, the trial court could properly conclude that Valdes' testimony regarding the existence of practices and procedures for reinsurance notification was not credible.

■ In its brief and during oral argument, Home argued that a retrieved reinsurance loss advice from an unrelated claim demonstrates that it had policies and procedures in effect for notifying London Reinsurers. The mere fact that a loss advice was sent to London Reinsurers in the past does not prove that Home had established practices and procedures for notification. In sum, the trial court's finding that Home's failure to provide timely notice was the result of gross negligence is amply supported by the record and is not the product of an error of law. As Home acted in bad faith, it was unnecessary for London Reinsurers to prove prejudice, and we decline to address Home's arguments on this issue.

*Affirmed.*

BROCK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.