**NEWCAP INSURANCE COMPANY,**
Plaintiff,

v.

**EMPLOYERS REINSURANCE CORPORATION,**
Defendant.

No. 02–2361–JWL.

United States District Court,
D. Kansas.

Dec. 12, 2003.

Kansas City, MO, Joanna Valk Stromberg, John S. Worden, Kathleen Ann Stimeling, Tracy C. Lemmon, Morgenstein & Jubelirer, L.L.P., San Francisco, CA, for Plaintiff.

Douglas S. Beck, John E. Jackson, III, Robert T. Adams, Shook, Hardy & Bacon L.L.P., Kansas City, MO, for Defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

This lawsuit arises from a reinsurance dispute between the reinsured, plaintiff NewCap Insurance Company ("NewCap"), and the reinsurer, defendant Employers Reinsurance Corporation ("ERC"). The matter is presently before the court on the parties' cross-motions for summary judgment (Docs. 59 & 62). For the reasons explained below, the court will grant ERC's motion and deny NewCap's motion with respect to the issue of whether New-Cap breached the notice provision of the reinsurance agreement. The court will otherwise deny the parties' motions because genuine issues of material fact exist regarding whether ERC was substantially prejudiced by NewCap's failure to give timely notice and whether ERC is excused from the requirement of demonstrating prejudice because NewCap failed to implement policies and procedures to insure that ERC would be notified of claims as required by the reinsurance agreement.

## STATEMENT OF MATERIAL FACTS [1]

### I. Nature of the Parties' Dispute

St. Mary's Medical Center in Evansville, Indiana (the "hospital") is owned by As-

Elizabeth Raines, James S. Kreamer, Baker, Sterchi, Cowden & Rice, L.L.C.,

---

1. In the argument sections of the parties' briefs, they discuss a variety of allegations that were not established in their numbered fact paragraphs. In ruling on the parties' cross-motions for summary judgment, the court will only consider the uncontroverted factual assertions established in their numbered fact paragraphs. *See, e.g., McNeal v.* *Stone,* No. 01–3097, 2003 WL 21005318, at *1 n. 1 (D.Kan. Apr.30, 2003) ("[T]he Court does not consider factual assertions which defendant sets forth only in the argument section of his brief and not in his numbered fact paragraphs."); *Tomita v. Univ. of Kan. Med. Ctr.,* 227 F.Supp.2d 1171, 1174 n. 4 (D.Kan.2002)

cension Health ("Ascension"). NewCap is an insurance company formed primarily to insure Ascension hospitals located throughout the United States. At all relevant times, NewCap provided insurance coverage to Ascension in excess of Ascension's $1 million self-insured retention through an umbrella liability insurance policy. NewCap, in turn, entered into a reinsurance agreement with ERC requiring ERC to indemnify NewCap for 100% of loss (subject to certain limits not implicated here). Thus, pursuant to the umbrella policy and the reinsurance policy, Ascension was ultimately responsible for the first $1 million of a loss, and ERC reinsured amounts above $1 million.

Dr. Gregory Loomis was a neurosurgeon in private practice at the hospital. On November 19, 1998, he stepped into a pantry to pour himself a cup of coffee. When he picked up the coffee pot, he allegedly slipped on some water and fell backward onto his left side, landing on his outstretched left arm. He allegedly developed severe pain in his left elbow, which was diagnosed as reflex sympathetic dystrophy ("RSD"), a syndrome where a body's repair mechanisms are activated in response to a normal injury "but never get turned off." Dr. Loomis claimed he was no longer able to work as a neurosurgeon and filed suit alleging the hospital failed to maintain the pantry floor in a reasonably safe condition. His case proceeded to trial and the jury returned a $16,950,000 verdict in favor of Dr. Loomis. After an unsuccessful appeal, the underlying action was settled for $16 million. NewCap then sought indemnification from ERC for $15 million.

The issue in this lawsuit is whether ERC is required to indemnify NewCap for this $15 million. It is undisputed that NewCap did not notify ERC of Dr. Loom-

is's claim until a day or two *after* the jury rendered its $16,950,000 verdict. ERC contends it is not required to indemnify NewCap because NewCap should have notified ERC of Dr. Loomis's claim sooner pursuant to certain notice provisions in the reinsurance agreement. At this point, an explanation of the history of the underlying case is in order.

## II. The Underlying Case

NewCap was created as an offshore, Cayman captive. It administers its excess policy through NewTech Risk Services ("NewTech"), which is the onshore administrative component of NewCap. Gregory Lee is the claims director for, and is employed by, both NewTech and Ascension. He supervised the NewTech/Ascension claims department at all relevant times. The hospital's risk managers, Ken Karmire and Marty Runge, were also involved in the management of Dr. Loomis's claim. In addition, Caronia Corporation ("Caronia") was involved with handling Dr. Loomis's claim. Caronia is a third-party administrator that provided claims management services to the NewTech/Ascension claims department. Lori Black was the litigation manager at Caronia who worked with NewTech/Ascension on Dr. Loomis's claim. The hospital hired James Riley to defend Dr. Loomis's claim. Mr. Riley, in turn, associated with Timothy Born, an Evansville attorney, as local counsel to assist him.

Dr. Loomis hired Gregory Meyer as an attorney to represent him. Mr. Meyer, in turn, hired Gregory Bubalo, an experienced trial attorney, to assist him with Dr. Loomis's case.

On November 29, 1999, Dr. Loomis's counsel sent a letter to defense counsel

("The Court does not consider factual assertions which the parties set forth only in the

argument section of their brief and not in their numbered fact paragraphs.").

detailing Dr. Loomis's claims and including supporting medical documentation. In that letter, Dr. Loomis alleged that he suffered from RSD which prevented him from practicing medicine, and which the parties have stipulated was a neurological injury. Dr. Loomis claimed economic damages, mostly from lost income, in excess of $15 million. He submitted a settlement demand of $13.4 million. At approximately the same time, he demanded a $33,000–per–month stipend from the hospital to cover his alleged lost wages. The hospital declined both requests.

On December 15, 1999, Dr. Loomis filed suit against the hospital in the Vanderburgh County Superior Court in Evansville, Indiana. The parties do not dispute that Vanderburgh County is considered a conservative venue. Prior to the verdict in Dr. Loomis's case, the highest plaintiff's personal injury verdict in Vanderburgh County was between $1 million and $2 million.[2]

The reserve on Dr. Loomis's claim had been set initially at $5,000. On December 20, 1999, it was raised to $100,000. On March 13, 2000, it was raised to $300,000.

On August 10, 2000, the parties engaged in their first mediation session. Dr. Loomis demanded $13.4 million and the hospital offered nothing.

Approximately four months prior to trial, in a letter dated March 26, 2001, Mr. Riley wrote a thorough evaluation letter to the hospital and Caronia. That letter provided a detailed analysis of the facts of the case, the various claims and defenses, the trial exposure, and thus the logical settlement factors the hospital must consider. The letter noted such things as the following: Dr. Loomis's damage claims were "huge"; Dr. Loomis, however, claimed he fell in water and never looked at the floor where he claimed he fell, which likely would produce a substantial comparative fault finding against him that might bar his claim entirely; Dr. Loomis had a long-standing tennis elbow problem that existed before the fall and his symptoms were recurring shortly before the fall; the room in which Dr. Loomis fell was carefully maintained and cleaned and mopped every day; nurses went in and out of that room approximately every ten minutes and had a regular practice of cleaning any spilled water or ice; three witnesses swore to being in the room shortly before Dr. Loomis's fall and none saw any ice or water on the floor; no one had ever been hurt in the room before; Dr. Loomis was a notorious figure in the Evansville area after a prior drunk driving episode; and the hospital had a fine reputation as a charitable organization in the Evansville area. Mr. Riley's letter concluded:

> Consideration of all these factors results in our opinion that there is a reasonable probability that the jury may find in favor of St. Mary's Hospital. However, that leaves some probability (20%) that the jury could find for Plaintiff. If it does, it could easily award damages of $18 million in excess of plaintiff's fault at 50%. In that case, the resulting judgment responsibility of St. Mary's Hospital is $9 million. There is a low probability (10%) that the jury would award Plaintiff $30 million and assess his fault at only 30%, resulting in a judgment of $21 million. Applying the probability percentages to those two damage awards to evaluate risk still yields substantial amounts ($1.8 million and $2.15 million, respectively.) [Sic] We emphasize that although the risk of losing at

---

**2.** In 1996, another case in which Mr. Born was defense counsel resulted in an approximately $10 million jury verdict. That verdict, however, was in Daviess County, Indiana, not Vanderburgh County, Indiana. The record does not reveal the relative proximity of these two counties.

trial is not high, the huge damages Plaintiff claims make even that limited risk one involving substantial amounts.

It is undisputed that Dr. Loomis would have recovered nothing under Indiana law if the jury would have found him 51% or more at fault. Mr. Meyer testified in his deposition that he could not specifically remember any case in Evansville history in which no comparative fault had been assigned to a plaintiff in a slip-and-fall case, although he had a vague recollection that there could have been one such case.

Ms. Black testified in her deposition that on April 4, 2001, she recommended to Mr. Lee that the reserve be raised to $1 million. Mr. Lee, however, believed the reserve should only be raised to $750,000, which is the level at which it was set and where it remained until after the verdict.

On April 11, 2001, a second mediation session took place. Dr. Loomis lowered his demand to $6.5 million and the hospital raised its offer to $150,000.

Approximately two weeks before trial, a mock jury study was conducted. Some of the findings of that study were: more than half of the 24 mock jurors would have awarded Dr. Loomis nothing; if asked to assume liability, 23 of the 24 mock jurors would have assigned comparative fault to Dr. Loomis and more than half would have assigned at least 51% fault to Dr. Loomis; 37% of the mock jurors favored Dr. Loomis; 23 of the 24 mock jurors would have assigned some responsibility to Dr. Loomis for his current condition, the median percentage responsibility assigned to Dr. Loomis was 60–80%, the average was 63%, and 54% assigned Dr. Loomis more than 50% responsibility; 21 of the 24 mock jurors assigned some responsibility to the hospital, the median percentage responsibility assigned to the hospital was 40%, the average was 37%, and 46% assigned the hospital more than 50% responsibility; 76% of the mock jurors awarded damages

to Dr. Loomis, the median was $1.7 million to $2 million, the mean was $5.28 million, and 11 of 24 awarded him at least $5 million. One deliberation group found in favor of the hospital, but nevertheless indicated a desire to award Dr. Loomis $2.5 million. A second deliberation group hung at 4–8, with more mock jurors favoring the hospital. During those deliberations, however, six of the defense-oriented jurors indicated a willingness to assign the hospital more than 50% responsibility as long as Dr. Loomis was not given a large damage award.

On July 19, 2001, five days before trial, Mr. Meyer told Mr. Riley that Dr. Loomis would come down from $6 million to $2 million if the hospital would come up to $1 million. The hospital responded with a $250,000 offer. The hospital only had authority to offer up to $250,000 to settle the case. Any greater amount of authority required approval by NewTech.

Caronia had no authority to settle Dr. Loomis's claim, but essentially acted as a "messenger" concerning settlement offers and demands between the hospital and NewTech/Ascension. Ms. Black testified in her deposition that, after the hospital tendered its entire $250,000 in authority, Caronia could not offer more unless additional authority was received from Mr. Lee. Further, Ms. Black testified that prior to the verdict Caronia had no authority to begin a dialogue concerning settlement at any time after offering the hospital's entire authority because Mr. Lee never authorized her to do so. Mr. Lee, however, testified in his deposition that he believed Ms. Black may have been conducting settlement negotiations during trial. In fact, no settlement negotiations took place during this time.

The jury returned a verdict for Dr. Loomis. The jury assessed 100% of the fault to the hospital and awarded Dr.

Loomis $16,950,000. Within a day or two after the verdict, Mr. Lee first notified ERC of Dr. Loomis's claim and asked ERC to cover the amount of the verdict in excess of the $1 million self-insured retention.

The ERC personnel who were primarily involved with claims under ERC's reinsurance agreement with NewCap were Dave Dolph and Daryl Douglas. On August 8, 2001, Mr. Dolph responded to NewCap that ERC was reserving its rights because NewCap's notice was untimely. Mr. Dolph cited three particular policy provisions:

> [I]t is necessary for [ERC] to reserve its rights in connection with this claim because of the late notice issue. We were not advised of this claim until after the verdict of $16,957,000 [sic] .... According to the contract entered into between [ERC] and [NewCap], any claim which involved "unanticipated neurological, sensory and/or systemic deficits" must be reported by the reinsured. Additionally, the contract ... requires that any loss be reported to [ERC] "where the reserve established by the reinsured in its own books excess of any applicable deductibles or self-insured retentions, is 50% or more of the retention (underlying amounts.)" It is my understanding that the reserve was increased to $750,000 prior to the verdict.
>
> Also, it is NewCap's responsibility to give prompt notice to [ERC] "of any claim which, in the reinsured's opinion, is likely to involve [ERC]." Given the huge damages Dr. Loomis was "blackboarding," everyone should have been aware that this claim was likely to involve ERC ....

The reinsurance provision does indeed contain the notice provisions relied upon by Mr. Dolph in his letter to NewCap. Specifically, it provides:

> [NewCap] agrees ... that it will give prompt notice to [ERC] of any claim which, in [NewCap]'s opinion is likely to involve [ERC] hereunder. However, any claim involving one of the following shall be reported to [ERC]:
>
> 1. Unanticipated neurological, sensory and/or systemic deficits including but not limited to brain damage, permanent paralysis, including paraplegia, partial or complete loss of sight, kidney failure or sepsis;
>
> . . . . .
>
> 7. Any loss where the reserve established by [NewCap] in its own books excess of any applicable deductibles or self-insured retentions, is 50% or more of the retention (underlying amounts).

For the next eighteen months, ERC representatives worked with Ascension, NewCap, and the hospital to resolve the underlying case. The matter ultimately settled for $16 million. NewCap then sought indemnification from ERC for $15 million. ERC denied NewCap's request for indemnity on the basis that NewCap failed to notify ERC of Dr. Loomis's claim as required by the reinsurance agreement.

### III. NewCap's Handling of Dr. Loomis's Claim

Ms. Black informed NewTech/Ascension of Dr. Loomis's fall and the possibility of a claim on December 17, 1998. At that time, the NewTech/Ascension claims department consisted of several employees. Ms. Black reported to claims adjuster Esther Zells.

In March or April of 1999, all of the employees in the NewTech/Ascension claims department were terminated except for Mr. Lee, who was then solely in charge of all claims. After that time, Caronia did not send general correspondence to Mr. Lee. It is undisputed that Mr. Lee, who was the only person in the department

after that time, first learned of Dr. Loomis's claim on April 1 or 2, 2001. This was approximately twenty-seven months after Caronia first informed NewTech/Ascension of the claim, fifteen months after the lawsuit was filed, and only four months prior to trial. Thus, during the approximately two-year period between March or April of 1999 and April of 2001, no one in the NewTech/Ascension claims department was aware of any developments with Dr. Loomis's claim. Mr. Lee admitted in his deposition that he did not receive enough information to make an informed decision regarding the proper settlement range "until very late in the game." It is undisputed, however, that Caronia monitored the claim during that time period.

Mr. Lee is the individual responsible for reporting claims to ERC on behalf of New-Cap. Caronia does not report to reinsurers. Ms. Black testified in her deposition that she did not know who the reinsurer was at the time of Dr. Loomis's claim, she did not know the requirements regarding when a claim must be reported to the reinsurer, and she could not recall having a conversation with anyone at New-Tech/Ascension concerning any claims reporting requirements prior to the verdict in Dr. Loomis's case.

After the verdict, in October of 2001, Mr. Lee e-mailed Ms. Black requesting information concerning when the defense knew the nature of the potential damages. In the e-mail, Mr. Lee indicated his assistant had searched the NewTech/Ascension files for documents regarding Dr. Loomis's claim, but "had not been able to locate anything."

NewCap points out that, at the time of Dr. Loomis's claim, Ascension had in place the following procedures for claims handling. When a hospital received a claim, the risk manager at that hospital filled out an initial report form and sent the form to both Ascension's claims manager and Ca-

ronia's investigator. Caronia would then set up a file for the claim and establish an initial reserve. Ascension also issued a formal assignment of the claim's investigation to Caronia, specifically outlining Ascension's expectations for the investigation, including periodic status reports throughout the investigation. Throughout the relationship between Ascension, New-Cap, and ERC during the past ten years, ERC has never expressed any concern that these procedures were anything other than appropriate.

## IV. Prejudice to ERC

It is undisputed that ERC did not have the right to control the defense of Dr. Loomis's claim. ERC did, however, have the right to participate in defending the claim. Specifically, the reinsurance agreement provided that ERC "may, at its own expense, participate with [NewCap] in the investigation, adjustment or defense of claims to which, in the judgment of [ERC], it is or might become exposed." ERC has experienced claims handlers who, when given proper notice, get involved in cases where ERC believes it may be exposed to loss. Mr. Lee admitted in his deposition that ERC "ranks near the top" with respect to its level of involvement in claims that get reported and that ERC is willing to "roll up its sleeves and get involved" in cases with high exposure. In fact, he testified that ERC was very involved in the resolution of another NewCap case where ERC was exposed to liability.

ERC circulates to its claim handlers a "Negotiation and Settlement Reference Guide," which is a collection of resources to be used in cases where ERC gets involved that are used to assist in obtaining a favorable result. ERC will often pressure a primary insured to take a less "hard-lined" negotiation stance and, as a result, often obtains a more favorable out-

come for itself. ERC's custom and practice throughout its relationship with Ascension and NewCap has been to strongly encourage Ascension and its affiliated hospitals to settle claims within the limits of the applicable retention. Thus, virtually all claims submitted to ERC by NewCap have been settled within those limits.

Dr. Loomis's counsel believed the personal feelings of the hospital's representatives prevented a pre-trial settlement. Mr. Meyer characterized the defense's settlement strategy as "worse than hardball," "foolish," and "unreasonable."

Once Mr. Lee became involved with Dr. Loomis's claim in the months immediately before trial, he had to persuade the hospital to offer some money in settlement. He believed the individuals at the hospital took a "personal position" with respect to settlement negotiations and that he needed to overcome the hospital's "emotional attachment" to the claim. Ms. Runge, the hospital's risk manager, indicated to Ms. Black that the hospital's administration wanted to "try the case as they would rather have a jury tell them what to pay as opposed to settling and having medical staff know they paid limits." Immediately after the verdict, defense counsel stated that the fact that "some of [Dr. Loomis's] medical staff colleagues at the Hospital thought badly of him and *were vehemently opposed to any pre-trial settlement* does not change the facts" (emphasis added).

Mr. Douglas, an ERC claims professional who would have been involved with Dr. Loomis's claim if it had been timely reported, testified in his deposition that the defense never made any reasonable offers to try to settle even though it was apparent Dr. Loomis wanted to discuss settlement at the beginning and throughout the progression of his claim. Mr. Douglas testified:

When it comes to settlement negotiations, I ... would not have held firm at a formal offer of $250,000. I would have reviewed Jim Riley's letter where he was talking about 1.8 to 2.5[sic] million and thought that that was a reasonable range and certainly would have tried to settle for as little as possible, but certainly would not have stayed at $250,000, because I think that guaranteed a verdict in this case, which I think is a bad idea.

Mr. Dolph, another ERC claims professional who would have also been involved, agreed that failing to negotiate further after the $250,000 offer was not what he would have recommended.

In July of 2001, just prior to trial (when the total settlement authority was already $1 million, and Dr. Loomis's counsel indicated Dr. Loomis would demand $2 million if the offer was raised to $1 million) ERC would have recommended negotiations take place up to the $750,000 reserve and/or $1 million authority if ERC had received timely notice. Dr. Loomis's counsel testified in his deposition that, at that time, unbeknownst to the defense, he was authorized to settle for $700,000.

If NewTech/Ascension had refused to allow its self-insured retention of $1 million to be offered, ERC would have sent a hammer letter stating NewCap's unreasonable settlement stance created a risk that ERC would not indemnify NewCap if an adverse verdict resulted.

Mr. Lee testified he would have offered $1 million on behalf of NewCap if "that is what it would take" and further testified he would not have objected to ERC adding $1 million of its own funds and settling Dr. Loomis's claim for a total of $2 million.

Based on these facts, NewCap and ERC each contend they are entitled to summary judgment. They dispute: (1) whether NewCap breached the notice provisions; (2) whether the law requires ERC to demonstrate substantial prejudice in order for

ERC to be relieved of its coverage obligations as well as whether ERC has demonstrated substantial prejudice; and (3) whether NewCap's failure to implement policies and procedures to insure that ERC received notice as required by the terms of the reinsurance agreement relieves ERC of the requirement to demonstrate that it was substantially prejudiced by NewCap's failure to give ERC timely notice.

## SUMMARY JUDGMENT STANDARD [3]

■ Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir.2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231–32 (10th Cir.2001) (citing *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding,* 279 F.3d at 904 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler,* 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *see also Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir.2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore,* 218 F.3d 1190, 1197–98 (10th Cir.2000) (quoting *Adler,* 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important proce-

---

**3.** Plaintiff and defendant have each filed a motion for summary judgment. The court will address the motions together. The legal standard does not change if the parties file cross-motions for summary judgment. Each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. *Atlantic Richfield Co. v. Farm Credit Bank,* 226 F.3d 1138, 1148 (10th Cir.2000).

dure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## ANALYSIS

For the reasons explained below, the court concludes that NewCap breached the reinsurance agreement by failing to give ERC timely notice of Dr. Loomis's claim. ERC is not relieved of its coverage obligations under Kansas law, however, unless ERC demonstrates it was substantially prejudiced by NewCap's failure to timely notify ERC of Dr. Loomis's claim, and the parties have demonstrated a genuine issue of material fact regarding whether ERC suffered any such prejudice. Further, even though the court at this juncture declines to decide whether or not Kansas courts would adopt a bad faith exception to the notice-prejudice rule in the reinsurance context, a genuine issue of material fact also exists regarding whether New-Cap had in place adequate policies and procedures for insuring that ERC would be notified of claims as required by the reinsurance agreement such that summary judgment must be denied on this issue.

## I. Breach of the Notice Provisions

ERC argues NewCap was required to report Dr. Loomis's claim pursuant to the neurological injury notice provision because Dr. Loomis's RSD is undisputedly a neurological injury and Caronia knew about the neurological nature of his injury by November 29, 1999, when Mr. Meyer sent Caronia a demand letter detailing Dr. Loomis's injuries and including supporting medical documentation. NewCap, however, argues the term "unanticipated" is ambiguous and must be construed against ERC.

 Under Kansas law,[4] the construction and interpretation of an insurance policy is a question of law to be determined by the court. *First Fin. Ins. Co. v. Bugg*, 265 Kan. 690, 694, 962 P.2d 515, 519 (1998). An insurance policy, like any other contract, must be construed to give effect to the parties' intent. *O'Bryan v. Columbia Ins. Group*, 274 Kan. 572, 575, 56 P.3d 789, 792 (2002); *Brumley v. Lee*, 265 Kan. 810, 812, 963 P.2d 1224, 1226 (1998); *Catholic Diocese v. Raymer*, 251 Kan. 689, 693, 840 P.2d 456, 459 (1992). If the language in the policy is clear and unambiguous, "it must be taken in its plain, ordinary, and popular sense." *O'Bryan*, 274 Kan. at 576, 56 P.3d at 792; *accord Bugg*, 265 Kan. at 694, 962 P.2d at 519. The language is ambiguous only if it contains provisions with "doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *O'Bryan*, 274 Kan. at 576, 56 P.3d at 792 (quoting *Catholic Diocese*, 251 Kan. at 693, 840 P.2d at 459). The words in the policy "are to be given the natural and ordinary meaning they convey to the ordinary mind." *Harmon v. Safeco Ins. Co. of Am.*, 24 Kan. App.2d 810, 812, 954 P.2d 7, 9 (1998) (citing *Kendall Plumbing, Inc. v. St. Paul Mercury Ins. Co.*, 189 Kan. 528, 532, 370 P.2d 396, 399 (1962)); *see also Fid. & Deposit Co. v. Hartford Cas. Ins. Co.*, 215 F.Supp.2d 1171, 1183 (D.Kan.2002) (quoting *Harmon* for this proposition).

---

**4.** The court will apply Kansas law in this diversity action because the reinsurance agreement appears to have been issued in Kansas, where ERC has its principal place of business, *see Simms v. Metropolitan Life Ins. Co.*, 9 Kan.App.2d 640, 642, 685 P.2d 321, 324 (1984) (in Kansas, the construction of a contract is governed by the law of the state in which the contract was made), and because ERC does not dispute NewCap's argument that the court should apply Kansas law. *See also Employers Reinsurance Corp. v. Newcap Ins. Co.*, 209 F.Supp.2d 1184, 1191 n. 8 (D.Kan.2002) (noting the parties stipulated to the application of Kansas law in a case involving the same parties).

■ Whether the language of a policy is ambiguous is a question of law to be decided by the court. *O'Bryan,* 274 Kan. at 576, 56 P.3d at 793; *Catholic Diocese,* 251 Kan. at 691, 840 P.2d at 458. "[T]he fact that an insurance policy does not define each term within it does not somehow make an undefined term ambiguous; ambiguity arises only if language at issue is subject to two or more reasonable interpretations and its proper meaning is uncertain." *Harmon,* 24 Kan.App.2d at 816, 954 P.2d at 11. "Courts should not strain to create an ambiguity where, in common sense, there is not one." *O'Bryan,* 274 Kan. at 576, 56 P.3d at 793; *accord First Fin.,* 265 Kan. at 694, 962 P.2d at 519.

■ Here, NewCap's argument that the word "unanticipated" renders the notice provision ambiguous strains to create an ambiguity where, in common sense, there is none. The court has no difficulty concluding that, giving the word "unanticipated" its natural and ordinary meaning, Dr. Loomis's injury was an unanticipated neurological injury. The term "unanticipated" simply means "unexpected" or "unforeseen." Webster's Third New International Dictionary 2482 (3d ed. unabridged 1993). Certainly, a neurological injury caused by a simple fall on a pantry floor is unanticipated, unexpected, and unforeseen within the common sense meanings of those words. Notably, although NewCap argues the term "unanticipated" is ambiguous, NewCap does not explain how Dr. Loomis's injury could be regarded as "anticipated" and thus outside the scope of this notice provision. Therefore, NewCap breached the unanticipated neurological injury notice provision when it failed to notify ERC of Dr. Loomis's claim promptly after November 29, 1999, when it learned about the neurological nature of Dr. Loomis's alleged injury.

NewCap also argues this neurological injury provision should be construed only to include more serious conditions than elbow pain such as the following types of injuries listed in the neurological injury notice provision: "brain damage, permanent paralysis, including paraplegia, partial or complete loss of sight, kidney failure or sepsis." The neurological injury notice provision, however, explicitly states that it includes "[u]nanticipated neurological, sensory and/or systemic deficits including *but not limited to* " (emphasis added) those types of serious conditions listed in the provision. Thus, the provision explicitly states that it is not limited to the listed types of neurological, sensory, and/or systemic deficits. It is undisputed that Dr. Loomis's RSD was a neurological injury, and the arguably lesser nature of his injury does not place it outside of the scope of this notice provision.

The court has also evaluated the other two notice provisions ERC relies on—that is, the provision requiring NewCap to notify ERC of any claim involving a "loss where the reserve established by [NewCap] in its own books in excess of any applicable deductibles or self-insured retentions is 50% or more of the retention" as well as the provision requiring NewCap to notify ERC of any claim which "in [NewCap]'s opinion, is likely to involve" ERC. In light of the court's ruling above that NewCap failed as a matter of law to provide ERC with timely notice as early as November of 1999, the court need not elaborate for purposes of ruling on the parties' motions for summary judgment on whether NewCap also failed to subsequently give ERC timely notice under these other two notice provisions. Suffice it to say, however, that at this procedural juncture the court is of the opinion that genuine issues of material fact exist regarding whether NewCap breached these other two notice provisions. If ERC wishes to attempt to establish breaches by NewCap of these other two notice provi-

sions, ERC is certainly welcome to present evidence on those issues at trial.

Accordingly, ERC's motion for summary judgment is granted and NewCap's motion for summary judgment is denied on the issue of whether NewCap breached the terms of the reinsurance agreement by failing to provide ERC with timely notice of Dr. Loomis's claim.

## II. Substantial Prejudice

■■■■■■■ Although NewCap failed to give timely notice as required by the reinsurance agreement, its breach of the contract does not automatically relieve ERC of its obligation to indemnify NewCap. Under Kansas law, untimely notice by the insured excuses performance by the insurer only if the insurer was actually prejudiced as a result of the untimely notice. *Cessna Aircraft Co. v. Hartford Acc. & Indem. Co.*, 900 F.Supp. 1489, 1515–16 (D.Kan.1995) (citing *Home Life Ins. Co. v. Clay*, 11 Kan.App.2d 280, 286–87, 719 P.2d 756, 761–62 (1986)). Prejudice is not presumed and the insurer bears the burden of proving that it was substantially prejudiced by the lack of notice. *Id.* "Generally, whether an insurer has been prejudiced from the failure to provide timely notice is a question of fact, but where the relevant facts are not in dispute it may be determined as a matter of law." *Id.*

■■■■■■■ ERC acknowledges this general rule of law as it applies to insurers, but contends this rule should not be extended to *re* insurers. The court disagrees. The Kansas Supreme Court has not specifically addressed this issue. However, the case of *Atchison, Topeka & Santa Fe Railway Co. v. Stonewall Insurance Co.*, 275 Kan. 698, 71 P.3d 1097 (2003), provides the court with adequate guidance that the

court can predict how the Kansas Supreme Court would decide this issue.[5] In that case, the Kansas Supreme Court affirmed the district court's ruling that an insured's failure to give excess insurers timely notice did not bar coverage because the excess insurers did not demonstrate substantial prejudice, which is a requirement under Kansas law. *Id.* at 759, 71 P.3d at 1137–38. Admittedly, the issue in that case was somewhat different than the one presented here because the excess insurers argued the district court should have applied Illinois law and determined that the excess insurers were not required to demonstrate prejudice under Illinois law. *Id.* at 760–62, 71 P.3d at 1138–39. However, the case is informative because the Kansas Supreme Court had no difficulty applying Kansas's well settled notice-prejudice rule in the context of a complex excess insurance dispute among sophisticated commercial entities. Thus, the court predicts that if the Kansas Supreme Court were confronted with the argument raised by ERC in this case, it would reject the argument and adhere to its general rule that an insurer, including a reinsurer, must demonstrate that it was prejudiced by the lack of notice in order to be relieved of its obligation to provide coverage.

The court is particularly confident that this prediction is accurate because it appears to be generally accepted that the notice-prejudice rule applies in the reinsurance context with at least as much force as it applies in the context of regular insurance. *See, e.g., British Ins. Co. of Cayman v. Safety National Cas.*, 335 F.3d 205, 207–15 (3d Cir.2003) (under New Jersey law, a reinsurer must demonstrate prejudice from the lack of notice); *Zenith Ins.*

---

**5.** When presented with a question of Kansas law that the Kansas Supreme Court has not resolved, the court's task is to predict how that court would rule on the issue. *Save*

*Palisade FruitLands v. Todd*, 279 F.3d 1204, 1207 n. 1 (10th Cir.2002) (citing *Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1574 (10th Cir.1984)).

*Co. v. Employers Ins.,* 141 F.3d 300, 307–08 (7th Cir.1998) (same, under Wisconsin law); *Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.,* 979 F.2d 268, 274 (2d Cir. 1992) (same, New York law); *Ins. Co. of the State of Penn. v. Associated Int'l Ins. Co.,* 922 F.2d 516, 523 (9th Cir.1990) (same, California law); *Security Mut. Cas. Co. v. Century Cas. Co.,* 531 F.2d 974, 975–79 (10th Cir.1976) (same, Colorado law); *see generally* 1 Couch on Insurance § 9:31, at 9–45 (3d ed. 1995) ("Prejudice from the late notice is usually required in order to invalidate or reduce the claim under a reinsurance contract ...."); 14 Holmes' Appleman on Insurance § 105.7, at 382–87 (2d ed.2000) (collecting cases and discussing this principle).

ERC relies primarily on *British Insurance Co. of Cayman v. Safety National Casualty Corp.,* 146 F.Supp.2d 585 (D.N.J. 2001), in which the District Court of New Jersey held that New Jersey's notice-prejudice rules does not apply to reinsurance contracts. *Id.* at 592–94. However, the Third Circuit subsequently reversed this decision, noting the "New Jersey Supreme Court's concern that an insured not forfeit the insurance benefits it has paid for absent sound reasons for denying the coverage" and concluding the New Jersey Supreme Court would likewise require a reinsurer to demonstrate prejudice. 335 F.3d 205, 211–15 (3d Cir.2003).

ERC also relies on *Liberty Mutual Insurance Co. v. Gibbs,* 773 F.2d 15 (1st Cir.1985), in which the First Circuit held the reinsurer need not demonstrate prejudice under Massachusetts law. However, the First Circuit's holding in *Liberty Mutual* rested on the fact that the reinsurance agreement at issue in that case made the required notice an express condition precedent to coverage. *Id.* at 17. By comparison, in this case ERC does not argue the reinsurance agreement contains any such express condition precedent language.

▆ Thus, in sum, the court believes the Kansas Supreme Court would extend the notice-prejudice rule to the reinsurance context. In addition, the court is of the opinion that a genuine issue of material fact exists regarding whether ERC was substantially prejudiced by NewCap's failure to provide timely notice.

On the one hand, NewCap had an informed belief that the jury would assign sufficient comparative fault to Dr. Loomis to entirely bar any recovery from the hospital. Therefore, the hospital was not inclined to offer a significant amount of money to settle the case. Thus, it can reasonably be inferred that the verdict was simply an unpredicted anomaly, and ERC is simply making suggestions about how it would have handled the claim now that it has the benefit of hindsight. Further, the reinsurance agreement only gave ERC the right to participate in the defense of the claim, not to control the defense. In *Atchison, Topeka & Santa Fe,* the district court similarly observed that the excess insurers " 'had no right nor obligation to control the defense or settlement of any claim.' " 275 Kan. at 759, 71 P.3d at 1137 (quoting the district court's opinion).

On the other hand, though, the district court in *Atchison, Topeka & Santa Fe* stated that many of the excess insurers " 'conceded that they would not have acted differently' " if they had been given notice earlier, *id.,* whereas in this case ERC concedes nothing of the sort. To the contrary, ERC contends it would have become actively involved in the case if it had known its potential exposure. It can reasonably be inferred from the record that the personal animosity between the hospital and Dr. Loomis prevented meaningful settlement discussions, that the hospital

and NewCap took an unreasonable approach toward settlement, that the case could have and should have been settled before trial for somewhere between $700,000 and $2 million, and that ERC would have provided the impetus for making that happen if ERC had been aware that it was potentially exposed to liability of such magnitude.

Ultimately, the issue of whether ERC suffered substantial prejudice because of NewCap's failure to timely notify ERC as required under the terms of the reinsurance agreement is a question for the trier of fact. Accordingly, both parties' motions for summary judgment on this issue are denied.

### III. Bad Faith Exception

Lastly, ERC cites *Unigard Security Insurance Co. v. North River Insurance Co.*, 4 F.3d 1049, 1069–70 (2d Cir.1993), and *Certain Underwriters at Lloyd's London v. Home Insurance Co.*, 146 N.H. 740, 783 A.2d 238, 240–41 (2001), for the proposition that it should be excused from the requirement of demonstrating substantial prejudice because NewCap failed to establish sufficient policies and procedures to ensure that ERC would receive notification of claims as required by the reinsurance agreement. Under this rule of law, the reinsurer may be entitled to relief absent a showing of prejudice if the reinsured acted in bad faith in failing to provide prompt notice. *Certain Underwriters*, 783 A.2d at 240 (citing *Unigard*, 4 F.3d at 1069). The reinsurer must demonstrate "that its reinsured acted with gross negligence or reck-

lessness in order to prove bad faith." *Id.* The distinction is as follows:

> "[I]f a [reinsured] has implemented routine practices and controls to ensure notification to reinsurers but inadvertence causes a lapse, the [reinsured] has not acted in bad faith. But if a [reinsured] does not implement such practices and controls, then it has willfully disregarded the risk to reinsurers and is guilty of gross negligence."

*Id.* (brackets in original; quoting *Unigard*, 4 F.3d at 1069).[6]

In this case, as with the issue of prejudice, the parties have also created a genuine issue of material fact on this issue. On the one hand, it can reasonably be inferred that NewCap failed to establish sufficient policies and procedures to ensure that ERC would be notified of claims as required by the reinsurance agreement. The record reveals that Ms. Black with Caronia was the only person dealing with developments in Dr. Loomis's claim on behalf of NewTech/Ascension for an approximately two-year period between March or April of 1999 until April 1 or 2, 2001. It is undisputed that she did not know the identity of NewTech/Ascension's reinsurer nor did she know when notice was required under the terms of the reinsurance agreement. Further, although Mr. Lee was admittedly the person who was responsible for reporting claims to ERC, there is no evidence currently in the record from which it can be inferred that he was aware of the precise notice requirements. NewCap has submitted an affida-

---

**6.** NewCap does not argue that Kansas courts would not adopt this rule of law, and therefore tacitly concedes, at least at this procedural juncture, that this rule of law applies. The court expresses no opinion on whether the Kansas Supreme Court would adopt such an exception, but simply observes that there is authority to the contrary. *See Zenith Ins. Co. v. Employers Ins.*, 141 F.3d 300, 307–08 (7th Cir.1998) (rejecting the suggestion that a bad faith exception to the notice-prejudice rule exists in the reinsurance context under Wisconsin law). The court believes that this legal question would benefit from further briefing by the parties and should be decided in connection with a motion for judgment as a matter of law under Fed.R.Civ.P. 50 at trial.

1244

vit suggesting that NewTech/Ascension had some policies and procedures in place for the handling of claims, but NewCap has notably failed to direct the court's attention to any of NewCap's policies and procedures governing the reporting of claims to ERC. Thus, the court is unable to hold as a matter of law that NewCap had sufficient policies and procedures in place to insure that ERC would receive notice of claims as required by the reinsurance agreement.

On the other hand, though, it can reasonably be inferred that ERC did in fact have in place sufficient policies and procedures. Mr. Lee became involved in Dr. Loomis's claim within days after defense counsel provided the evaluation letter that essentially placed a value on Dr. Loomis's claim of $1.8 million to $2.15 million. This was nearly four months prior to trial and gave Mr. Lee, the individual who was responsible for reporting claims to ERC, ample notice of the nature and value of Dr. Loomis's claim. Mr. Lee simply chose not to report that claim to ERC. Further, the record reveals that ERC was previously involved in another claim with NewCap, and therefore it can reasonably be inferred that NewCap does indeed have in place adequate policies and procedures for reporting claims to ERC. Thus, it may simply be that a lapse in procedures caused the failure to report Dr. Loomis's claim.

Accordingly, both parties' motions for summary judgment are denied with respect to the bad faith exception to the notice-prejudice rule because even if the court assumes, without deciding, that Kansas courts would adopt such an exception, a genuine issue of material fact exists regarding whether NewCap had sufficient policies and procedures in place to insure that ERC would be notified of claims as required by the reinsurance agreement.

**IT IS THEREFORE ORDERED BY THE COURT** that the parties' cross-mo-

tions for summary judgment (Docs. 59 & 62) are granted in part and denied in part. Specifically, ERC's motion is granted and NewCap's motion is denied with respect to the issue of whether NewCap breached the notice provision. Both motions are denied with respect to the issues of substantial prejudice and whether ERC is excused from the requirement of demonstrating substantial prejudice because NewCap failed to implement adequate policies and procedures to ensure that ERC would be notified of claims as required by the reinsurance agreement.