No. 85,363

JOHN A. O'BRYAN and PAUL SCALETTY, *Appellees*, v. COLUMBIA INSURANCE GROUP, *Appellant*.

(56 P.3d 789)

Opinion filed October 25, 2002.

*William J. Gotfredson*, of Monaco, Sanders, Gotfredson & Racine, of Kansas City, Missouri, argued the cause, and *Aaron J. Racine*, of the same firm, was with him on the brief for appellant.

*Gerald L. Thompson*, of Sinclair, Sawyer, Thompson, Haynes & Cowing, P.C., of Kansas City, Missouri, argued the cause, and *Andrew S. Mendelson*, of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

LOCKETT, J.: This case comes before the court on a petition for review from the Court of Appeals' unpublished decision in *O'Bryan v. Columbia Ins. Group*, No. 85,363, filed January 11, 2002. Appellees John O'Bryan and Paul Scaletty appeal the Court of Appeals' (1) reversal of the district court's grant of summary judgment and the district court's finding that the insurance contract was unambiguous, (2) determination that as a matter of public policy the common-law rule against under insuring applies, and (3) grant of summary judgment to the insurer on public policy grounds.

O'Bryan purchased an insurance policy from Columbia Insurance Group (Columbia) providing $40,000 coverage on a dwelling. Coverage under the policy was for a 1-year term beginning September 19, 1997. A fire occurred at the insured dwelling in November 1997. Columbia paid O'Bryan $37,105.50 for the loss sustained to the dwelling as a result of the fire.

In March 1998, another fire occurred at the insured dwelling. At that time, none of the damage caused by the first fire had been repaired. O'Bryan submitted a $40,000 claim to Columbia as a result of the second fire, complying with the terms and conditions of the insurance policy. The amount of damage arising out of the second fire was in excess of $40,000. Columbia tendered $2,894.50 as the amount of coverage remaining under the policy. O'Bryan refused to accept the tender and filed suit. Upon Columbia's motion, Scaletty was added as a necessary party to the lawsuit, having acquired a 50 percent interest in the insured property. O'Bryan and Scaletty are collectively referred to as O'Bryan herein.

Columbia filed a motion for summary judgment, alleging it was entitled to deduct the amount paid for the loss sustained in the first fire from the $40,000 in determining the amount of coverage remaining for the loss sustained in the second fire. O'Bryan filed a cross-motion for summary judgment, alleging the $40,000 was

the limit of liability per loss and that Columbia was not entitled to deduct the money paid for the first loss in determining the coverage available for the second loss. The parties agreed that no material facts were in dispute.

After hearing arguments, the district court denied Columbia's motion for summary judgment and granted O'Bryan's motion for summary judgment in part and denied it in part. The district court applied the rules regarding interpretation of an insurance policy and determined that the insurance policy was unambiguous. The court held that the policy provided a second additional limit of $40,000 that applied to the second fire. In reaching this decision, the district court relied upon the language of section 2 of the Conditions section of the policy and the case of *U.S. Liability Ins. Co. v. Bove*, 347 So. 2d 678 (Fla. Dist. App. 1977). The analysis of the district court is further discussed herein. The court awarded judgment to O'Bryan for $40,000 and denied O'Bryan's request for attorney fees and prejudgment interest.

On appeal, the Court of Appeals reversed the district court's decision and remanded the case with instructions to the district court that judgment be entered on behalf of Columbia. In its opinion, the Court of Appeals stated the applicable rules for judicial interpretation of a written insurance contract, disregarded the rules, and made a public policy decision. In reaching its decision, the Court of Appeals cited 12 Couch on Insurance 3d § 175:15 (1998) and concluded that "the common-law rule which permits deducting the amount of the first claim from the policy limit in determining the amount of insurance available to pay a second claim ought to prevail."

Under Kansas law, the common law, as modified by constitutional and statutory law, judicial decisions, and the conditions and wants of the people, remains in force and effect. K.S.A. 77-109. "Public policy consists of the principles and standards regarded by the legislature or by the courts as being of fundamental concern to the state and the whole society." *Bolz v. State Farm Mut. Auto. Ins. Co.*, 274 Kan. 420, Syl. ¶ 3, 52 P.3d 898 (2002). However, in Kansas, insurance is and has long been recognized as being a highly statutorily regulated industry. See K.S.A. 40-101 *et seq.*; K.A.R. 40-

1-19 *et seq.*; *Spencer v. Aetna Life & Casualty Ins. Co.*, 227 Kan. 914, 923-26, 611 P.2d 149 (1980); *Holmstrom v. Sullivan*, 192 Kan. 746, 391 P.2d 100 (1964); *cf. Bolz*, 274 Kan. 420. Courts should avoid making public policy where the statutory law has developed.

In adopting a common-law rule, the Court of Appeals set forth what it believed to be the public policy of Kansas. We have previously acknowledged that the declaration of public policy is primarily a legislative function. *Bolz*, 274 Kan. 420, Syl. ¶ 3. Judicial lawmaking responsibility arises from the decision of disputes of private rights and liabilities. It is not the duty of the courts to decide public-law questions of policy affecting these disputes. This court has repeatedly set forth the rules regarding the construction of insurance policies, yet the Court of Appeals abandoned the rules, which are the established judicial policy for interpreting the rights and duties of parties to a written insurance policy, and made a public policy decision. In determining that there was fundamental concern that required a change of the law, the Court of Appeals erred and is reversed.

## Rules of Construction

The rules regarding the construction of insurance policies under Kansas law are well established. The language of an insurance policy, like any other contract, must, if possible, be construed in such way as to give effect to the intention of the parties. *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 693, 840 P.2d 456 (1992); *American Media, Inc. v. Home Indemnity Co.*, 232 Kan. 737, 740, 658 P.2d 1015 (1983). In construing a policy of insurance, a court should consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter, and the purpose to be accomplished. *Farm Bureau Mut. Ins. Co. v. Horinek*, 233 Kan. 175, Syl. ¶ 3, 660 P.2d 1374 (1983).

Because the insurer prepares its own contracts, it has a duty to make the meaning clear. If the insurer intends to restrict or limit coverage under the policy, it must use clear and unambiguous language; otherwise, the policy will be liberally construed in favor of the insured. *Catholic Diocese*, 251 Kan. at 693; *Patrons Mut. Ins.*

*Ass'n v. Harmon*, 240 Kan. 707, 713, 732 P.2d 741 (1987). If an insurance policy's language is clear and unambiguous, it must be taken in its plain, ordinary, and popular sense. *First Financial Ins. Co. v. Bugg*, 265 Kan. 690, 694, 962 P.2d 515 (1998). In such case, there is no need for judicial interpretation or the application of rules of liberal construction. *American Media*, 232 Kan. at 740. The court shall not make another contract for the parties and must enforce the contract as made. *Patrons*, 240 Kan. at 713.

However, where the terms of an insurance policy are ambiguous or uncertain, conflicting, or susceptible of more than one construction, the construction most favorable to the insured must prevail. *Catholic Diocese*, 251 Kan. at 693; *Patrons*, 240 Kan. at 713.

"To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning." *Catholic Diocese*, 251 Kan. at 693.

Whether a written instrument is ambiguous is a question of law to be decided by the courts. *Catholic Diocese*, 251 Kan. at 691. Courts should not strain to create an ambiguity where, in common sense, there is not one. *First Financial*, 265 Kan. at 694. The test in determining whether an insurance contract is ambiguous is not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean. *First Financial*, 265 Kan. at 694.

## District Court's Grant of Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact.

In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *Friesen-Hall v. Colle*, 270 Kan. 611, 613, 17 P.3d 349 (2001); *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 (1999).

Neither party asserts there is a dispute as to a material fact that renders a finding of summary judgment improper. Therefore, the issue before the court is the construction of the insurance policy and the determination as to which party is entitled to summary judgment. The construction of a written instrument is a question of law, which construction by a lower court need be given no deference on appeal. *First Financial*, 265 Kan. 690, Syl. ¶ 1; *Patrons*, 240 Kan. at 713.

The relevant provisions of the insurance policy are as follows:

"This insurance applies to the Described Location, Coverage for which a Limit of Liability is shown and Perils Insured Against for which a Premium is stated.

### COVERAGES AND LIMITS OF LIABILITY

"A. Dwelling . . .
$40,000 . . . "
"2. **Insurable Interest and Limit of Liability**. Even if more than one person has an insurable interest in the property covered, *we will not be liable in any one loss*:
    "**a.** for an amount greater than the interest of a person insured under this policy; or
    "**b.** for more than the applicable limit of liability." (Emphasis added.)

Columbia contended the following provisions were also relevant before the Court of Appeals:

"5. **Loss Settlement**. Covered property losses are settled at actual cash value at the time of loss but not more than the amount required to repair or replace the damaged property."

"**DEFINITIONS**
"The term 'Actual Cash Value' means:
"The amount which it would cost to repair or replace covered property with material of like kind and quality, less allowance for physical deterioration and depreciation, including obsolescence."

We must now determine whether the district court was correct in determining the policy was unambiguous and in granting summary judgment to the insured. Provisions within the insurance policy indicate that Columbia contemplated that more than one loss might occur within the policy period and that perhaps each loss would exceed $40,000. O'Bryan cites to section 2 of the Conditions section of the policy, relied upon by the district court, which refers to Columbia's limit of liability and provides that Columbia will not be liable "in any one loss" for more than the applicable limit of liability. Columbia asserts that this provision is not applicable to the legal issue before this court and should not be read outside of context. Columbia contends that this provision only applies when there are multiple insureds making separate claims under the policy for the same loss. While true that this provision does address Columbia's liability in situations where there are multiple insureds, the provision also addresses limits of liability in general.

The decision in *Bove*, 347 So. 2d 678, also relied upon by the district court in rendering its decision, has only limited application to the case at bar. In *Bove*, the homeowner's policy had a total liability limit of $16,000, with a liability limit of $500 in any one occurrence for theft of jewelry. The policy provided:

" '2. Special Limits on Certain Property:
" 'a) . . .
" 'b) Under coverage C, this company shall not be liable for loss in any one occurrence with respect to the following property for more than:
" '(4) $500 in the aggregate for loss by theft of jewelry, watches, necklaces, bracelets, gems, precious and semi-precious stones, gold, platinum and furs, including articles containing fur, which represents its principal value;' " 347 So. 2d at 679.

The *Bove* court noted that the phrase "in any one occurrence" set no limit on the number of losses the insured might claim, only on the coverage limits per loss. 347 So. 2d at 680. The district court's reliance on *Bove* was likely based upon the policy provision's similarity to the "Insurable Interest and Limit of Liability" provision in this case.

Another provision of the policy that neither party cites that also supports a $40,000 per occurrence policy limit is the provision in-

suring against volcanic eruption. The Conditions section of the policy provides:

"**25. Volcanic Eruption Period**. One or more volcanic eruptions that occur within a 72-hour period will be considered as one volcanic eruption."

An insurance policy is to be construed by the court as a whole. *Farm Bureau,* 233 Kan. 175, Syl. ¶ 3. If the $40,000 limit of coverage is the limit of coverage throughout the policy period, the purpose served by quantifying the time period that constitutes one volcanic eruption is meaningless.

Furthermore, the policy's provision regarding cancellation also supports the interpretation that the $40,000 limit of liability applies to each loss occurring during the time the contract is in force.

"**17. Cancellation.**

"**a.** You may cancel this policy at any time by returning it to us or by letting us know in writing the date cancellation is to take effect.

. . . .

"**c.** When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata."

The policy does not contain a provision which would allow for a refund to be reduced based on the amount paid out under the policy. Thus, if the limit of liability was $40,000 for the entire policy period, an individual could arguably cancel the policy after having suffered a loss of any amount, including a loss totaling the full $40,000, and be refunded the pro rata portion of the premium. Such a cancellation provision is only logical if the $40,000 limit applied on a per loss basis.

There is one provision of the policy, however, that supports Columbia's interpretation that the $40,000 limit of liability is applied to all losses sustained within the policy period. That provision is entitled "COVERAGES AND LIMITS OF LIABILITY" and states that there is $40,000 coverage on the dwelling and that a "limit of liability is shown." We note that this provision does not clearly identify whether the insurer's limit of liability is the limit of liability per loss or total limit throughout the policy period. In order to determine the meaning and significance of this provision, the

remainder of the policy provisions must be examined. See *Farm Bureau*, 233 Kan. 175, Syl. ¶ 3.

## Analysis

A similar insurance policy was found ambiguous in a similar scenario in *Michael v. National Sec. Fire & Cas. Co.*, 458 F. Supp. 128 (N.D. Miss. 1978). In that case, Michael purchased $15,000 of fire insurance from National Security, with the first year's premium being paid in advance. Subsequently, the insured commercial property was partially destroyed by fire, and National Security paid Michael $15,000. Michael immediately repaired the property. Less than 3 months later, the insured property once again sustained fire damage and was totally destroyed. National Security denied liability for the second loss, claiming that its liability was limited to $15,000, the face amount of the policy. The court noted that the policy provided that National Security agreed to insure Michael for the actual cash value of the property at the time of loss " 'for the term specified [one year] . . . to an amount not exceeding the amount(s) above specified [$15,000].' " 458 F. Supp. at 130.

The *Michael* court found the insurance policy to be ambiguous for the following reasons: (1) The policy failed to state whether coverage was provided on a $15,000 per occurrence basis or whether payments totaling $15,000 constituted a limit of liability without regard to the number of losses or the time period of the policy, and (2) the policy did not state that payment of the $15,000 face value of the policy would automatically terminate further liability of the insurer. 458 F. Supp. at 130. The court noted that as drafter of the policy, National Security had the power to use language that would clearly exclude the risk of liability for successive losses, but that it had failed to do so. 458 F. Supp. at 130. See also *Slater v. United States Fidelity & Guaranty Co.*, 379 Mass. 801, 809, 400 N.E.2d 1256 (1980) (use of words "one occurrence" in policy without definition or other aid gives rise to ambiguity to be construed against insurer).

For there to be an ambiguity there must be genuine uncertainty as to which of two possible meanings apply. *Catholic Diocese*, 251 Kan. at 693. This necessarily requires that the meanings suggested

by the parties be reasonable. Thus, we must evaluate the reasonableness of O'Bryan's and Columbia's assertions.

We note that there are two views regarding recovery for successive losses, *i.e.*, the "Historical View" and the "Modern View."

### "Successive Losses - Historical View That Each Loss Reduces Remaining Coverage

"By the older view, where successive losses coming within the policy coverage are sustained, the maximum amount for which the policy is written is not increased by the number of losses or any other multiple, but remains constant. Hence after each loss is paid, the amount of insurance remaining is reduced by the amount of such payment. A policy may also provide that all losses thereunder reduce coverage, so that where two successive losses occur during the same policy period, the amount paid under the first claim is required to be deducted from the policy limit in determining the amount available with respect to the second claim." 12 Couch on Insurance 3d § 175:15 (1998).

### "Modern View That Policy Limit Applies to Each Loss

"Contrary to the view that total amount available for recovery for each successive loss is reduced by the amount of prior losses, other jurisdictions hold that the insured may recover up to the face value of the policy regardless of the number of successive losses provided that the insured sustains an actual loss." 12 Couch on Insurance 3d § 175:16.

The Court of Appeals adopted the historical view that each loss reduces the remaining coverage under the policy, finding that this rule is "practical, reasonable, *and sound public policy*." (Emphasis added.) The Court of Appeals stated:

"To accept O'Bryan's position here would, in our view, fly in the face of logic and reasonable business judgment. To accept O'Bryan's view, a windfall would result to the insured in any situation such as this. For example, if the dwelling here was insured only for $40,000 and the cost of total replacement was $400,000, then, in theory, the insurance company would be required to pay for 10 successive losses of $40,000 each on a policy with a stated limit of $40,000. We conclude that this would be contrary to public policy and the intent of the contracting parties."

For some reason, the Court of Appeals also found it noteworthy that no repairs had been made to the property following the first loss and that the home was underinsured. This statement seems to indicate that the panel believed O'Bryan might have engaged in

some type of fraud, but there is no support for this conclusion in the record.

In making its decision that the $40,000 limit applied per loss, the district court made the following observations:

"THE COURT: Now, I have other questions here. After the first fire did plaintiff continue to pay premiums for the insurance policy that's the question.

"MR. THOMPSON [Plaintiff's counsel]: It was all in one policy period, so.

"THE COURT: So, they prepaid for that?

"MR. THOMPSON: The premium had been paid.

. . . .

"THE COURT: . . . . *But once you have a loss and the insurance company pays you for that first time, I'm asking I guess the defendant this, does that mean that you don't have any more insurance; now you're not insured for the rest of the policy period because you've already been paid the limit of that policy so now, you're uninsured?*

"MR. GOTFREDSON [Defense counsel]: *Under this type of policy that's correct.* Now, after the first loss there were still some policy limit left and then after the second one we tendered the amount. Now, there would be no refund of premium because the company has earned the premium they charged the premium to pay the loss up to the limit and they've earned the premium so there would be no refund." (Emphasis added.)

We note that defense counsel's statement to the district court does not appear to be consistent with the cancellation provisions of the policy as discussed previously.

In further support of its argument that the $40,000 limit of liability is applied cumulatively to all losses within the policy period, Columbia also relies upon the fact the insurance policy did not contain a reinstatement clause or a loss clause. A reinstatement clause is a clause in which the insurer expressly agrees that full policy limits reinstate after the occurrence of covered loss during the policy period. A loss clause is a clause in which the insurer expressly agrees that full policy limits are not reduced by the occurrence of covered loss during the policy period. See *Palilla v. St. Paul Fire and Marine Insurance Co.*, 322 So. 2d 46, 48 (Fla. Dist. App. 1975) (in absence of loss clause, insurer held liable, at most, in case of successive losses by fire, for difference between amount paid on first loss and amount named on policy as its coverage). To

adopt Columbia's reasoning, however, would go against the well-established rule that the insurer has the obligation to make the meaning of its policy clear. See *Catholic Diocese*, 251 Kan. at 693 (if insurer intends to restrict or limit coverage it must use clear and unambiguous language in doing so).

Columbia had the ability to contractually limit coverage under the policy to $40,000 for the entire policy period, as long as it did so clearly and unambiguously. Here, however, because the policy does not specifically provide whether the $40,000 is the limit of liability for the entire policy period or per loss and the insurer's interpretations create an ambiguity, we find the policy to be ambiguous. Where an insurance policy is ambiguous, the construction most favorable to the insured must prevail. *Catholic Diocese*, 251 Kan. at 693. Thus, the district court was correct in granting O'Bryan summary judgment. See *Drake v. Kansas Dept. of Revenue*, 272 Kan. 231, 32 P.3d 705 (2001) (if trial court reaches right result, its decision will be upheld even though it relied upon wrong ground or assigned erroneous reasons for its decision).

We reverse the Court of Appeals' decision reversing the district court and affirm the district court's decision granting partial summary judgment in favor of O'Bryan.

LARSON, S.J., assigned.