**PARK UNIVERSITY ENTERPRISES, INC., Plaintiff,**

v.

**AMERICAN CASUALTY COMPANY OF READING, PA, Defendant.**

No. 03–2522–GTV.

United States District Court, D. Kansas.

April 15, 2004.

Heywood H. Davis, Dicus, Davis, Sands & Collins, Kansas City, MO, Thomas M.

**1098**

Van Camp, Van Camp, Meacham & Newman, PLLC, Pinehurst, NC, for Plaintiff.

William H. White, Jr., Bonner Kiernan Trebach & Crociata, Washington, DC, Barry W. McCormick, McCormick, Adam & Long, P.A., Overland Park, KS, Andrew Butz, Bonner Kiernan Trebach & Crociata, Washington, DC, for Defendant.

### MEMORANDUM AND ORDER

VANBEBBER, Senior District Judge.

This insurance contract case comes before the court on cross-motions for partial judgment on the pleadings (Docs. 25 and 30). Plaintiff Park University Enterprises, Inc. ("Park") claims that Defendant American Casualty Company of Reading, PA ("American") has a duty to defend Park in an underlying state court action brought pursuant to the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and seeks declaratory judgment to that effect. Park also seeks damages for breach of contract. Ultimately, Park claims that American has a duty to indemnify Park for any damages incurred in the underlying state court action, but the indemnification claims are not yet ripe for review.

For the following reasons, the court grants Park's motion for partial judgment on the pleadings (Doc. 25) as it relates to the duty to defend, and denies American's motion (Doc. 30).

### I. Factual and Legal Background

The following facts are taken from the pleadings and attachments.

On October 16, 2002, JC Hauling Company sued Park in the Circuit Court of St. Clair County, Illinois. In that action, JC Hauling alleges that Park engaged in the following acts:

5. On or about June 19, 2002, [Park] used or caused to be used a telephone facsimile machine, computer, or other device to send a 1–page advertisement to Plaintiff's telephone facsimile machine in Illinois.

6. Said advertising materials were sent via facsimile transmission to ... Plaintiff without prior express invitation or permission.

. . . .

15. [Park's] actions were willful and knowing in that [Park] consciously and deliberately sent or caused to be sent a one page advertisement to Plaintiff's telephone facsimile machine, and [Park] knew or should have known that it did not have the prior express invitation or permission of Plaintiff and the other members of the Class to send the advertisements and knew or should have known that its actions constitute a violation of law.

JC Hauling alleges that Park's acts violated the TCPA. JC Hauling brought the state court action as a putative class action, alleging that Park transmitted numerous unsolicited facsimiles.

The TCPA provides that "[i]t shall be unlawful for any person within the United States ... to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine...." 47 U.S.C. § 227(b). "Unsolicited advertisement" is defined as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." Id. § 227(a)(4). Recipients of facsimiles in violation of the TCPA may pursue a private right of action. Id. § 227(b)(3). Through such action, a recipient may obtain injunctive relief and recover actual monetary losses, or $500 for each violation, whichever is greater. Id. If the court finds that the defendant willfully or knowingly violated the TCPA, the court may award treble damages. Id.

In the state court action, Park admits that it transmitted advertisement(s) by facsimile, but denies that any such advertisement was unsolicited. Park maintains that it has an existing business or customer relationship with JC Hauling and any other recipients, and that it did not transmit any advertising material without prior express permission and/or invitation. Park further denies intentionally violating the TCPA.

On November 1, 2002, Park gave notice of the underlying state court action to American, its liability insurance carrier. American notified Park on November 5, 2002 that it would not provide a defense or coverage in connection with the underlying state court action. Park then filed the instant suit.

Park claims that American owes a duty to defend under two provisions of the insurance policy: (1) "property damage" liability coverage, and (2) "advertising injury" liability coverage. With respect to property damage liability, the policy provides:

Coverage A. Bodily Injury and Property Damage Liability

1. Insuring Agreement

 a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages....

 b. This insurance applies to "bodily injury" and "property damage" only if:

 1. The "bodily injury" or "property damage" is caused by an "occurrence"....

"Property damage," according to the policy, means "[l]oss of use of tangible property that is not physically injured...." The policy defines an "occurrence" as an "accident, including continuous exposure or repeated exposure to substantially the same general harmful conditions." The policy does not define the word "accident." The policy does not define the term "loss of use." Coverage for "property damage" does not apply to property damage expected or intended from the standpoint of the insured.

With respect to advertising injury liability, the policy provides:

Coverage B. Personal and Advertising Injury Liability

1. Insuring Agreement

 a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages....

Under the policy, "advertising injury" means "injury, including consequential bodily injury, arising out of ... oral or written publication of material that violates a person's right of privacy." The term "advertisement" means "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters." The policy does not define "right of privacy" or "oral or written publication."

## II. Standard of Review

Both parties have moved for partial judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). To evaluate a Rule 12(c) motion for judgment on the pleadings, the court employs the same standard that it uses to analyze a Rule 12(b)(6) motion to dismiss. *Ramirez v. Dep't of Corr.*, 222 F.3d 1238, 1240 (10th Cir.2000)

(citation omitted). A Rule 12(b)(6) motion to dismiss will be granted only if it appears beyond a doubt that the plaintiff is unable to prove any set of facts entitling her to relief under her theory of recovery. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "All well-pleaded facts, as distinguished from conclusory allegations, must be taken as true." *Swanson v. Bixler,* 750 F.2d 810, 813 (10th Cir.1984) (citation omitted). The court must view all reasonable inferences in favor of the plaintiff, and the pleadings must be liberally construed. *Id.* (citation omitted). The issue in reviewing the sufficiency of a complaint is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support her claims. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

### III. Discussion

The issue before the court is whether Park's insurance policy with American possibly covers the acts allegedly taken by Park in violation of the TCPA. If the court determines that there is a " 'potential of liability,' even if remote," then American has a duty to defend Park in the underlying state court action. *See Spivey v. Safeco Ins. Co.,* 254 Kan. 237, 865 P.2d 182, 188 (1993) (citing *MGM, Inc. v. Liberty Mut. Ins. Co.,* 253 Kan. 198, 855 P.2d 77, 79 (1993)). The court concludes that American does have such duty to defend.

#### A. Contract Interpretation and Duty to Defend Standards

The parties agree that Kansas law governs whether American has a duty to defend Park in the underlying state court action. *See generally, Layne Christensen Co. v. Zurich Canada,* 30 Kan.App.2d 128, 38 P.3d 757, 766 (2002). To determine whether American bears the duty to defend, the court must interpret the insurance contract between the parties.

 When interpreting a written contract, the court seeks to ascertain the intent of the parties. *Marquis v. State Farm Fire & Cas. Co.,* 265 Kan. 317, 961 P.2d 1213, 1219 (1998); *Catholic Diocese of Dodge City v. Raymer,* 251 Kan. 689, 840 P.2d 456, 459 (1992). Unless the contract is ambiguous, both the intention of the parties and the meaning of the contract must be determined exclusively from the instrument itself. *Rigby v. Clinical Reference Lab., Inc.,* 995 F.Supp. 1217, 1226 (D.Kan.1998). Ambiguity is a question of law. *O'Bryan v. Columbia Ins. Group,* 274 Kan. 572, 56 P.3d 789, 793 (2002) (citation omitted); *Catholic Diocese of Dodge City,* 840 P.2d at 458. "In determining whether ambiguity exists, the language of the contract is to receive a fair, reasonable, and practical construction." *Marquis,* 961 P.2d at 1219. A contract is ambiguous only when the words used to express the meaning and intent of the parties are "insufficient in that the contract may be understood to reach two or more possible meanings." *Amoco Prod. Co. v. Charles B. Wilson, Jr., Inc.,* 266 Kan. 1084, 976 P.2d 941, 945 (1999) (citation omitted); *see also Liggatt v. Employers Mut. Cas. Co.,* 273 Kan. 915, 46 P.3d 1120, 1125 (2002). "[C]ourts should not strain to create an ambiguity where, in common sense, there is none." *First Fin. Ins. Co. v. Bugg,* 265 Kan. 690, 962 P.2d 515, 519 (1998) (citation omitted). That the parties differ as to what an unambiguous contract requires does not mandate that this court declare the contract ambiguous. *Ryco Packaging Corp. v. Chapelle Int'l Ltd.,* 23 Kan.App.2d 30, 926 P.2d 669, 674 (1996).

 "[M]eaning should be ascertained by examining the documents from all four corners and by considering all of the pertinent provisions, rather than by critical

analysis of a single or isolated provision...." *Akandas, Inc. v. Klippel*, 250 Kan. 458, 827 P.2d 37, 44 (1992) (citation omitted); *see also Gray v. Manhattan Med. Ctr., Inc.*, 28 Kan.App.2d 572, 18 P.3d 291, 298 (Kan.Ct.App.2001). An unambiguous contract must be enforced according to its plain, general, and common meaning in order to ensure that the parties' intentions are enforced. *O'Bryan*, 56 P.3d at 792 (citation omitted); *Boos v. Nat'l Fed'n of State High Sch. Assn's*, 20 Kan.App.2d 517, 889 P.2d 797, 803 (1995).

"Because the insurer prepares its own contracts, it has a duty to make the meaning clear. If the insurer intends to restrict or limit coverage under the policy, it must use clear and unambiguous language; otherwise, the policy will be liberally construed in favor of the insured." *O'Bryan*, 56 P.3d at 792 (citations omitted). "The test ... is not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean." *Id.* at 793 (citation omitted). If the insurer claims that there is an exception under the policy, the insurer assumes the burden of proving that the case falls within the exception. *Marquis*, 961 P.2d at 1220–21 (citation omitted). The insurer must define any limitations on coverage clearly and explicitly. *Id.* at 1220 (citation omitted).

An insurer's duty to defend is distinct from the duty to indemnify. *Quality Painting, Inc. v. Truck Ins. Exch.*, 26 Kan.App.2d 473, 988 P.2d 749, 752 (1999) (citation omitted). The insurer bears the duty to defend when there is a "potential of liability" under the policy. *Id.* (citation omitted). To determine whether the "potential of liability" exists, the insurer should examine the allegations in the complaint and any other discovered or reasonably discoverable facts. *Id.* (citation omitted); *see also United Wats, Inc. v. Cincinnati Ins. Co.*, 971 F.Supp. 1375,

1382 (D.Kan.1997). While allegations of an intentional act may not be covered, " '[w]here the complaint alleges both a negligent and intentional act, these alleged facts give rise to the potential for liability, and the duty to defend arises.' " *Quality Painting*, 988 P.2d at 752 (citation omitted). If the facts, including facts beyond the pleadings, "give rise to a 'potential of liability,' even if remote, under the policy, the insurer bears a duty to defend." *Spivey*, 865 P.2d at 188 (citing *MGM*, 855 P.2d at 79). "[T]he duty to defend rests primarily on the possibility that coverage exists, and the possibility of coverage must be determined by a good faith analysis of all information the insurer may know, or could have reasonably ascertained." *Spivey*, 865 P.2d at 188. "So long as the insured can show a non-frivolous possibility that the claim against it may fall within the coverage of the insurance contract, the insurer has a duty to defend the insured." *Am. Motorists Ins. Co. v. Gen. Host Corp.*, 946 F.2d 1489, 1490 (10th Cir.1991).

### B. *"Property Damage" Coverage*

Park claims that American has a duty to defend under the "property damage" provisions of the insurance policy. A duty to defend arises under the property damage provisions when a plaintiff alleges that an "occurrence" caused the "loss of use" of tangible property. American maintains that neither a "loss of use" nor an "occurrence" is at issue in the instant case. For the following reasons, the court determines that American has a duty to defend under the property damage provisions of the policy.

#### 1. *"Loss of Use"*

Park first argues that a "loss of use" is at play in the instant case because any time a facsimile machine is used to print an advertisement, the recipient of the fac-

simile necessarily experiences temporary loss of use of the machine, as well as the paper and toner. Park's position is supported by the legislative history of the TCPA and *Prime TV, LLC. v. Travelers Ins. Co.*, 223 F.Supp.2d 744, 750 & n. 2 (M.D.N.C.2002), *appeal docketed,* (4th Cir. 2004).

The legislative history indicates that one of the reasons Congress adopted the facsimile provisions of the TCPA was to alleviate unwanted loss of use of facsimile machines:

> First, it [fax advertising] shifts some of the costs of advertising from the sender to the recipient. Second, it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax.
>
> . . . .
>
> In the case of fax advertising ... the recipient assumes both the cost associated with the use of the facsimile machine, and the cost of the expensive paper used to print out facsimile messages....

H.R.Rep. No. 102–317, at 10, 25 (1991) (cited in *Destination Ventures, Ltd. v. F.C.C.*, 844 F.Supp. 632, 636 (D.Or.1994)). Based on this history, the *Prime TV* court held that "as a result of the DirecTV facsimiles, the recipients lost the use of their fax machines as well as permanent loss [sic] of facsimile paper and ink." 223 F.Supp.2d at 750.

American submits that the only way the printing of a one-page advertisement could constitute "loss of use" is if the recipient's facsimile machine is continually in use. The court disagrees. A recipient of an unsolicited facsimile experiences loss of use any time the paper or toner is used to print the advertisement. Moreover, a recipient may experience loss of use of the facsimile machine even if it is not continually being used; all that is required is the attempted simultaneous transmittal of two

facsimiles. Such loss of use need not be specifically pleaded in the underlying state court action. The court is willing to presume that the potential loss of use is present. For these reasons, the court concludes that the "loss of use" requirement of the property damage provisions potentially may be met.

#### 2. Occurrence

Park next argues that the transmittal of the facsimile advertisement constituted an "occurrence" because any unsolicited transmittal was accidental; Park thought that it was transmitting the advertisement to existing business customers who wanted to know about its programs. The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." For the following reasons, the court concludes that Park's actions may have constituted an "occurrence" under the policy. In other words, there is a "potential of liability" under the property damage provisions of the insurance policy. *See Spivey,* 865 P.2d at 188 (citation omitted).

#### a. The Relevance of Park's Denial

As an initial matter, the parties spend much time debating the relevance of Park's denial in the state court action of intentionally sending an unsolicited facsimile. Park argues that its denial is information that American should have considered in making its good faith analysis of whether the policy provides coverage, and American argues that Park's denial is immaterial because " 'just as we cannot allow insurers to recharacterize negligent conduct as intentional, we cannot allow the insured to recast intentional conduct as merely negligent.' " *Quality Painting,* 988 P.2d at 754 (citation omitted). The court need not address whether Park's denial is relevant because the JC Hauling complaint includes alternative pleading.

JC Hauling alleges that Park *knew or should have known* that the facsimile was unsolicited. "Should have known" is a term connoting negligence, not intention. Restated, the JC Hauling complaint alleges alternatively that Park either (1) intentionally sent the facsimile, knowing that the recipient did not invite it, or (2) intentionally sent the facsimile, negligently believing that the recipient invited it. Because the JC Hauling complaint alleges that Park may have acted negligently, American should have considered that allegation when evaluating whether to defend Park in the underlying state court action.

American claims that the JC Hauling suit does not involve alternative theories of liability; according to American, Park may only be held liable in the JC Hauling suit if it intentionally sent unsolicited facsimiles to JC Hauling and the putative class members. The court disagrees. The TCPA is essentially a strict liability statute—even if Park erroneously faxed advertisements to recipients with whom it did not have an existing business relationship, Park may be held liable under the TCPA for its actions (albeit without treble damages). JC Hauling recognized the implicit negligence component of the TCPA when it alleged that Park knew or should have known that the JC Hauling facsimile was unsolicited.

American attempts to distinguish the instant case from cases where an underlying complaint alleged facts giving rise to liability based either on an intentional act or on negligence. *See, e.g., Am. Motorists Ins. Co.*, 946 F.2d at 1491–92 (finding duty to defend where extrinsic facts supported the possibility that the alleged pollution might have resulted from "sudden and accidental" event); *Stegman v. Hunter Health Clinic, Inc.*, No. 97–1048–WEB, 1998 WL 748953, at *1–2 (D.Kan. Oct.23, 1998) (holding that facts available to insurer

showed a possibility of coverage for defamation, even though retaliatory employment discrimination was not covered); *Spruill Motors, Inc. v. Universal Underwriters Ins. Co.*, 212 Kan. 681, 512 P.2d 403, 404–08 (1973) (holding that taking of truck from owner's yard was intentional, but that injury was due to negligent manner of driving truck). The court does not view the cases as distinguishable. The JC Hauling complaint alleges alternative theories of liability, and American should have fully considered those allegations in determining whether it had a duty to defend.

> b. Natural and Probable
> Consequences Test

American's core argument and slight variations of it reverberate throughout its briefs. Repeatedly, American assumes that: (1) because JC Hauling alleges that Park intentionally sent the facsimile, and (2) because Park must have known that the foreseeable consequence of sending the facsimile was that the recipient's facsimile machine would have to receive and print the facsimile, then (3) Park must have intended to send an unsolicited facsimile, violate the TCPA, and injure JC Hauling. The court rejects this rationale for the following reasons.

Kansas follows the "natural and probable consequences" test in determining whether an injury is accidental. *Harris v. Richards*, 254 Kan. 549, 867 P.2d 325, 328 (1994) (citation omitted). The "insured's intent to injure can be inferred when the resulting injury is a natural and probable consequence of the insured's act." *Id.* at 327–28. Allowing an insured to simply state that it did not intend to inflict injury would force insurers to defend cases where the acts were clearly intended to injure. *See Quality Painting*, 988 P.2d at 754. However, an intentional act may yield an unintended injury. *Cessna Aircraft Co. v. Hartford Acc. & Indem.*

**1104**

Co., 900 F.Supp. 1489, 1505 (D.Kan.1995); *Spruill Motors,* 512 P.2d at 408; *Gowing v. Great Plains Mut. Ins. Co.,* 207 Kan. 78, 483 P.2d 1072, 1076 (1971) (noting that there is a distinction between an intentional injury and an unintended injury resulting from an intentional act) (citations omitted); *State Farm Fire & Cas. Co. v. Falley,* 23 Kan.App.2d 21, 926 P.2d 664, 668 (1996).

■■■ American urges the court to follow *Western Rim Investment Advisors, Inc. v. Gulf Insurance Co.,* 269 F.Supp.2d 836, 843–45 (N.D.Tex.2003), *appeal docketed,* (5th Cir.2004), where the court held that TCPA claims do not result from an occurrence, because the property damages involved are the intended and expected effects of the policyholder's actions, even if the policyholder thought it had acted with the recipient's permission. The *Western Rim* court reached its decision based on Texas law, which is contrary to the law of Kansas. Under Texas law, if an act is intentional, then there can be no "accident," regardless of whether the resulting injury was unintended or unexpected. *Argonaut S.W. Ins. Co. v. Maupin,* 500 S.W.2d 633, 635 (Tex.1973). Kansas has explicitly rejected this legal principle. *See Falley,* 926 P.2d at 668.

American also cites numerous other cases in support of its position. The cases cited by American are distinguishable. In each case, the court held that intent to injure could be inferred from an intentional act because the injury was the natural and probable consequence of the act. The acts at issue in the cases included the intentional discharge of firearms, intentional assault and battery, sexual harassment, and intimidation. *See generally Quality Painting,* 988 P.2d at 750–51 (considering facts where insured engaged in acts of intentional sexual harassment and discrimination); *Harris,* 867 P.2d at 326 (considering facts where insured fired

shots into pickup truck knowing that his ex-wife was in the truck and that the truck did not belong to his ex-wife); *Spivey,* 865 P.2d at 184, 186 (considering facts where insured threatened an employee with a knife and gun, discharged a gun at her, and forced her to perform sexual acts); *Bell v. Tilton,* 234 Kan. 461, 674 P.2d 468, 470 (1983) (considering facts where insured intended to discharge BB gun toward playmate's face); *Cas. Reciprocal Exch. v. Thomas,* 7 Kan.App.2d 718, 647 P.2d 1361, 1362–63 (1982) (considering facts where insured pointed gun at individual and fired). These cases and the egregious facts they involved do not justify an inference that because Park intended to send a facsimile, Park also intended to injure the recipient.

American argues that even if the facsimile was solicited, Park nevertheless intended to use JC Hauling's facsimile paper, toner, electricity, and facsimile machine. That is, American postulates that any time you send a facsimile, you intend to inflict damage on the recipient. According to American, the damages JC Hauling allegedly suffered as a result of Park's TCPA violation did not result from Park's alleged failure to obtain prior permission from JC Hauling; instead, the damages resulted from Park's intentional transmittal of the facsimile advertisement. In support, American cites the legislative history of the TCPA:

> Facsimile machines are designed to accept, process, and print all messages which arrive over their dedicated lines. The fax advertiser takes advantage of this basic design by sending advertisements to available fax numbers, knowing that it will be received and printed by the recipient's machine....

H.R.Rep. No. 102–317, at 10 (cited in *Destination Ventures, Ltd.,* 844 F.Supp. at 636). "The junk fax advertiser is a nui-

sance who wants to print [his or her advertisement] on your paper. That call seizes your fax machine so that it is not available for calls you want or need...." Hearing, House Subcommittee on Telecommunications and Finance, 102nd Cong., 1st Sess. 52 (1991). American argues that such a premeditated shifting of economic costs cannot constitute an "occurrence."

American's logic is flawed. A facsimile recipient does not incur actionable damages if he or she welcomes or solicits a facsimile, even if the recipient's paper and toner is used. Therefore, if Park believed, even erroneously, that it was sending a facsimile to someone who wanted such facsimile, then Park did not intend to cause damages.

Moreover, as Park points out, American's duty to defend only has the potential of arising when there is a "suit." There can only be a "suit" when a facsimile allegedly constitutes an unsolicited advertisement as defined by the TCPA. The mere fact, standing alone, that Park sent a facsimile and used the recipient's facsimile machine would not result in a "suit," thereby potentially implicating a duty to defend.

Finally, American claims that even if negligence is presumed on the part of Park, negligent acts cannot constitute an "occurrence" under the policy. In support, American cites District of Kansas cases that have speculated that Kansas courts would not consider negligent behavior an "accident." In *U.S. Fidelity & Guaranty Co. v. Dealers Leasing, Inc.*, 137 F.Supp.2d 1257, 1262 (D.Kan.2001), Judge Lungstrum stated:

> This court believes that, if faced with the issue, the Kansas Supreme Court would conclude that such negligence and negligent misrepresentation does not constitute an "accident." While negligence often leads to an accident, negligent behavior is not itself an "accident." ... This interpretation is consistent with the

generally accepted definition of an "accident" set out by the Kansas Supreme Court. Negligent conduct itself is not an undesigned, sudden, or unexpected event of an afflictive or unfortunate character, but often the cause of such an event.

Similarly, in *Cincinnati Insurance Co. v. Professional Data Services, Inc.*, No. 01–2610–CM, 2003 WL 22102138, at *8–9 (D.Kan. July 18, 2003), the court considered whether allegations of negligent performance and negligent misrepresentation constituted an "occurrence" under an insurance policy. Relying on *Harris* and *Dealers Leasing*, Judge Murguia concluded that none of the underlying claims constituted an "occurrence" under the policy.

The cases cited by American are distinguishable. In each case, the court was facing issues of causation. Here, any negligent act (i.e., the transmittal of an unsolicited advertisement) is an accident in and of itself. Park's alleged negligence directly caused any damages sustained by the facsimile recipient(s). The court therefore need not follow the rationale in *Dealers Leasing* or *Professional Data Services*.

For the above-stated reasons, the court concludes that any damages sustained by JC Hauling may not have been the natural and probable consequence of Park's actions. There is a possibility that American may ultimately be bound to indemnify Park under the property damage provisions of the policy, and thus American owes Park a duty to defend.

### 3. "Expected or Intended Injury"

■ American argues that even if the property damage provisions apply, coverage is precluded by an exclusion for "expected or intended injury." The court disagrees, for essentially the same reasons stated above.

■ Exclusions must be strictly construed against the insurer. *Bugg,* 962 P.2d at 522. American's argument rests on the presumption that the facsimile was intentionally unsolicited. Alternatively, American reiterates that even if the facsimile was solicited, Park nevertheless intended to use JC Hauling's facsimile paper, toner, electricity, and facsimile machine. The court has already rejected both of these arguments.

### 4. Non–Fortuity

■ American next argues that as a matter of public policy, it should not be required to defend a case for damages that are non-fortuitous. American contends that this issue is one of first impression. However, the court concludes that this issue is yet another permutation of American's underlying assumption that Park intended to send an unsolicited facsimile and cause JC Hauling's damages. *See Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co.,* 275 Kan. 698, 71 P.3d 1097, 1134–35 (2003) (observing that non-fortuity defense is normally based on the term "accident" in a policy).

The same analysis applied to the "occurrence" issue is relevant here. The court concludes that any damage incurred by JC Hauling may have been fortuitous. The court also rejects American's non-fortuity argument with respect to advertising injury that is raised later in American's briefs.

### C. "Advertising Injury" Coverage

■ Park also contends that American has a duty to defend because the TCPA claim falls under the policy's "advertising injury" coverage. The relevant terms provide for coverage of "[o]ral or written publication of material that violates a person's right of privacy." American maintains that there is no "publication," "material," "person," or "right of privacy" involved.

Every court that has addressed the question of advertising injury has held that a TCPA claim falls under an insurance policy's "advertising injury" coverage. *See TIG Ins. Co. v. Dallas Basketball, Ltd.,* 129 S.W.3d 232 (Tex.Ct.App.2004); *Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.,* 300 F.Supp.2d 888 (E.D.Mo.2004); *Hooters of Augusta v. Am. Global Ins. Co.,* 272 F.Supp.2d 1365 (S.D.Ga.2003); *W. Rim,* 269 F.Supp.2d 836; *Prime TV,* 223 F.Supp.2d 744. This court agrees that there is at least a possibility of coverage under the advertising injury provisions of the insurance policy.

### 1. Publication

First, for there to be "advertising injury" under the policy, there must be a "publication." American argues that transmittal of unsolicited facsimile advertisements does not involve "publication" because "publication" requires sending information to a third party. The court disagrees.

American did not define "publication" in its policy. If American intended to limit the scope of "publication" to those materials sent to a third party, it should have so stated in the policy.

The terms of today's standard insurance policy are pre-determined by the insurance carrier itself and, long in advance of the individual insurance sale, those terms have been incorporated into the insurance package presented to the prospective buyer. The free give-and-take of the open marketplace does not prevail in the insurance industry. The buyer's freedom of choice in selecting a policy is severely limited: if he desires casualty insurance, he must normally accept the printed policy with the usual printed provisions—else he can leave it.

Under such circumstances, concerning which we are not inclined to be critical, the law, in its concern for even-handed

fairness, has attempted to minimize the imbalance between insurer and insured, so far as it is possible, by means of a rule that in the event of ambiguity or conflict in the policy provisions, a policy of insurance is to be construed strictly against the insurer and in favor of the insured.

*Gowing,* 483 P.2d at 1074–75.

■■■ The court determines that the word "publication" is ambiguous. More than one possible meaning exists for the word. As American contends, it could mean the transmittal of material to a third party. Or, as Park suggests, it could simply mean the transmittal of material, even if not to a third person. When conflicting meanings are possible, the court must construe the policy against the insurer. *See id.* The appropriate inquiry is what a reasonable person in the position of the insured would understand the word to mean. *Id.* at 1076; *Casey v. Aetna Cas. & Sur. Co.,* 205 Kan. 495, 470 P.2d 821, 826 (1970). The court is mindful that this rule "should not be confused with the insured's uninformed expectations of the policy coverage; it only requires the policy to be read as a reasonably prudent insured would read it." *Prof'l Data Servs.,* 2003 WL 22102138, at *4. The court concludes that under the "reasonable person in the position of the insured" standard, "publication" could include the transmittal of material, regardless of whether such transmittal is to a third party.

Other courts have held that because an insurance company neglected to define "publication," the word must be construed broadly, and would include transmitting a facsimile to a recipient. *See, e.g., Dallas Basketball,* 129 S.W.3d 232, 237–38 (holding that "publication" is not limited to utterance or disclosure to third parties because the policy did not define the term); *W. Rim,* 269 F.Supp.2d at 846–47 (holding that the insured's alleged acts of

faxing the advertisements to recipients *may* constitute written publication).

American urges the court to follow the reasoning in *MGM, Inc. v. Liberty Mutual Insurance Co.* In *MGM,* the insured sought coverage and a defense from its insurance company in a wiretapping suit. 855 P.2d at 78. The insured was the corporation that owned and operated a restaurant. *Id.* The president of the corporation became concerned over long distance telephone charges from a phone at the restaurant, and bugged the phone, recording and listening to the calls. *Id.* Employees of the restaurant brought suit, alleging that the president had violated their privacy rights by installing the secret listening devices. *Id.* The corporation sought insurance coverage, but the insurer denied coverage, in part on the grounds that "there was no publication or utterance of the intercepted telephone conversations and hence the employees' claims were not included within the policy['s] personal injury definitions." *Id.* at 79.

*MGM* is distinguishable. The case involved neither an advertisement nor advertising injury coverage. Significantly, *MGM* also did not involve a recipient of written material. *MGM*'s holding is not dispositive of the "publication" issue.

American points out in its reply brief that the TCPA does not mention "publication"—instead, the TCPA speaks in terms of "using any telephone facsimile machine, computer or other device to send an unsolicited fax advertisement to a telephone facsimile machine." 47 U.S.C. § 227(b)(1)(C). Whether the TCPA mentions the term "publication" is immaterial. Legislators should not be expected to mimic phrasing in insurance policies in order for insureds to receive coverage for unintentional statutory violations.

American also argues that applying Park's definition of "publication" would re-

sult in an illogical definition elsewhere in the policy. Again, if American feared an absurd result, it should have defined "publication" in the policy.

For all of the above-stated reasons, the court concludes that "publication" may be involved in the instant case.

### 2. Material

Second, an insured must publish "material" in order for the advertising injury coverage to apply. American argues that the TCPA's prohibition of unsolicited facsimile advertisements does not involve "material" because the content of the facsimile is not regulated—the mere transmittal or arrival of an unsolicited facsimile completes the offense before the recipient even looks at the facsimile. American reasons that the TCPA does not prohibit certain content, or "material"; it simply prohibits unsolicited communication by facsimile.

Contrary to American's assertion, the TCPA is concerned with content; in order to violate the Act, an unsolicited facsimile must have advertising content. *See* 47 U.S.C. § 227. The court concludes that such advertising content, as well as the paper containing it, may constitute "material."

### 3. Person

Third, a "person's" right of privacy must be involved to trigger advertising injury coverage. American alleges that because the facsimile was sent to the JC Hauling's business offices, and since JC Hauling is the named plaintiff, a "person's" right of privacy is not involved. The court disagrees.

The facsimile at issue was specifically sent to Ms. Patty Evansco, albeit at her place of work. Moreover, the facsimile was intended to be sent to an individual; "indeed, the advertisements would have been worthless if people did not receive them." *Hooters of Augusta*, 272

F.Supp.2d at 1374 n. 7. Finally, the underlying state court action is a putative class action, in which individuals are potential class members. While the court recognizes that there is no class unless and until the Illinois court certifies a class, the court is unwilling to hold at this stage of the litigation that a "person" is not involved.

### 4. Invasion of Privacy

Finally, the advertising injury provisions require that a "right of privacy" be violated. American makes two classes of arguments with respect to the right of privacy requirement: (1) Congress was not concerned with privacy rights when it enacted the provisions of the TCPA prohibiting unsolicited facsimile advertising; and (2) unsolicited facsimile advertising does not infringe on the recipient's right of privacy. The court rejects both lines of argument.

#### a. Legislative History of the TCPA

American first argues that the TCPA limits commercial facsimile advertisements as a "nuisance," not as an "invasion of privacy." Because an invasion of privacy is not involved in a TCPA claim for unsolicited facsimiles, American argues, any such claim does not fall under the "advertising injury" provisions of the insurance policy. The court disagrees.

American postulates that the portion of the TCPA restricting the use of facsimile advertising focuses solely on two problems: (1) unfairly shifting the costs of advertisement from the advertiser to the recipient, and (2) occupying the recipient's machine so it is unavailable for desired messages. According to American, the facsimile-advertising prohibitions of the TCPA constitute mere economic regulation, not creation of a new right of privacy. American contends that Park and other courts have relied indiscriminately on passages from the TCPA's legislative history relating solely to protecting residential telephone subscribers from automated sales calls,

and have failed to acknowledge that Congress only intended to facilitate interstate commerce by restricting the use of facsimile advertisements. *See* S.Rep. No. 102–178, at 1 (1991) ("The purposes of the bill are to protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile (fax) machines and automatic dialers.").

As noted above, other courts have held that the TCPA's facsimile advertising limitations are related to invasion of privacy concerns. *Lou Fusz Auto. Network,* 300 F.Supp.2d at 894–95 (quoting Eighth Circuit case that held that " 'Congress found telemarketing solicitations by a person to be less of a nuisance or an invasion of privacy than artificial or prerecorded calls,' and that '[a]rtificial or prerecorded messages, *like a faxed advertisement,* were believed to have heightened intrusiveness...'.") (citation omitted); *Dallas Basketball,* 129 S.W.3d 232, 237 (stating that the TCPA "presumes all advertising, so long as it is unsolicited, is an offensive intrusion into the recipient's solitude"); *Hooters of Augusta,* 272 F.Supp.2d at 1372–74 (asserting that the TCPA is intended to protect privacy rights of individual employees at a place of business); *W. Rim,* 269 F.Supp.2d at 847 ("The stated purpose of the TCPA ... is to protect the privacy of individuals from receiving unsolicited faxed advertisements.") (citations omitted).

The other courts addressing this issue may or may not have generally read all of the TCPA legislative history together. But regardless of whether Congress specifically used the term "invasion of privacy" with respect to the advertising facsimile provisions, the underlying concerns prompting the legislation support a determination that Congress also sought to address the right for facsimile recipients to be left alone. Congress endeavored to curb the interruptions in one's day due to unsolicited facsimiles and eliminate interference with the receipt of legitimate business facsimiles. Implicit in both of these concerns is recognition of the right to be left alone. Accordingly, the court concludes that the TCPA's legislative history shows that Congress sought to protect privacy rights with the legislation.

b. Meaning of "Right of Privacy"

American next argues that a "right of privacy" is not involved in facsimile advertising cases because unsolicited facsimiles involve, at most, the tort of "intrusion on seclusion," which is different than violation of the right of privacy. Park counters that "privacy is privacy," and because transmitting an unwanted facsimile constitutes an intrusion on seclusion, it violates one's right of privacy. The court accepts Park's definition of privacy.

At the heart of this matter is an insurance contract. This case is about interpreting the terms of a contract, not drawing fine lines between different types of torts. Like "publication," the term "right of privacy" is open to numerous interpretations. It may be defined by importing Illinois tort standards, as American suggests, or it may be defined in layman's terms. If American thought Illinois tort standards should apply, it should have indicated as much in the policy. Because American did not, the interpretation of a reasonable person in the position of the insured prevails.

The *Hooters of Augusta* court noted that, in layman's terms, privacy is understood as the "freedom from unauthorized intrusion" or the "right to be left alone." 272 F.Supp.2d at 1372. The court determined that "a layman understands his right to be left alone to include being left alone at work by advertisers sending unso-

licited faxes." *Id.* at 1373. The *Lou Fusz Automotive Network* court also declined to impose the common law definition of the tort of invasion of privacy into the policy language, concluding that "these definitions are inappropriate because they are not the plain and ordinary meaning of the respective terms, and the policy does not tie the disputed terms to the common-law causes of action." 300 F.Supp.2d at 895; *see also Dallas Basketball,* 129 S.W.3d 232, 237; *W. Rim,* 269 F.Supp.2d at 847.

The court agrees with the *Hooters of Augusta* and *Lou Fusz Automotive Network* courts. The plain and ordinary meaning of privacy includes the right to be left alone, unburdened by unsolicited facsimiles. For these reasons, the court concludes that American has a duty to defend under the advertising injury provisions of the policy.

### E. Exclusions to Coverage

Finally, American argues that even if the advertising injury provisions apply, exclusions to coverage operate to justify denial of the duty to defend. The court disagrees.

#### 1. "Criminal Act" Exclusion

■■■■■ The policy excludes coverage for advertising injury that "aris[es] out of a criminal act committed by or at the direction of any insured." American argues that the alleged violations of the TCPA also violate 720 ILCS § 5/26–3, which makes criminal the knowing use of a facsimile machine to transmit unsolicited advertising. Specifically, the statute provides:

> No person shall knowingly use a facsimile machine to send or cause to be sent to another person a facsimile of a document containing unsolicited advertising or fund-raising material, except to a person which the sender knows or under all of the circumstances reasonably believes has given the sender permission, either on a case by case or continuing basis, for the sending of such material.

720 ILCS § 5/26–3(b). Again, American faces the same problem as with all of its arguments assuming that Park intentionally targeted people who did not solicit its advertisements. 720 ILCS § 5/26–3(b) only prohibits *knowingly* using a facsimile machine to send unsolicited advertising. The complaint in the underlying state court action does not allege only that Park *knew* that the facsimile was unsolicited; the complaint also alleges that Park *should have known* that the facsimile was unsolicited. Moreover, the complaint does not allege a criminal act under 720 ILCS § 5/26–3. For these reasons, the court cannot conclude that there is no possibility of coverage under the policy.[1]

#### 2. Intentional Infliction of Advertising Injury Exclusion

■■■■■ The policy also excludes coverage for advertising injury that is "[c]aused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" American argues that this exclusion operates to preclude coverage under the policy. For the same reasons the court has rejected all of American's arguments along this line, the court also rejects this argument.

---

**1.** To the extent that a ruling on the relevance of Park's denial of knowingly or intentionally sending an *unsolicited* facsimile is necessary to support the criminal act exclusion ruling, the court holds that American should have considered Park's pleadings in its coverage determination. Particularly with respect to whether the criminal act exclusion applies, Park's denial may indeed be relevant to whether there is a potential of liability under the policy.

### IV. Conclusion

In sum, the court concludes that a potential of coverage exists under both the property damage and advertising injury provisions of the policy. American owes Park a duty to defend in the underlying state court action.

As a final note, the parties have filed exhaustive briefs, raising a host of issues and arguments. In the interest of judicial economy, the court may not have mentioned every argument or discussed it in detail. The parties should be assured, however, that the court has fully considered all of their positions.

IT IS, THEREFORE, BY THE COURT ORDERED that Park's motion for partial judgment on the pleadings (Doc. 25) is granted and American's motion for partial judgment on the pleadings (Doc. 30) is denied.

Copies or notice of this order shall be transmitted to counsel of record.

**IT IS SO ORDERED.**